# RIGGINS *v.* NEVADA

No. 90–8466.   Argued January 15, 1992—Decided May 18, 1992

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, and SOUTER, JJ., joined. KENNEDY, J., filed an opinion concurring in the judgment, *post*, p. 138. THOMAS, J., filed a dissenting opinion, in which SCALIA, J., joined except as to Part II–A, *post*, p. 146.

*Mace J. Yampolsky* argued the cause for petitioner. With him on the briefs were *Jay Topkis, Neal H. Klausner,* and *Steven C. Herzog.*

*James Tufteland* argued the cause for respondent. With him on the brief was *Rex Bell.**

---

*Briefs of *amici curiae* urging reversal were filed for the Coalition for Fundamental Rights of Equality of Ex-patients by *Peter Margulies, Herbert Semmel,* and *Patrick Reilly;* for the National Association of Criminal

JUSTICE O'CONNOR delivered the opinion of the Court.

Petitioner David Riggins challenges his murder and robbery convictions on the ground that the State of Nevada unconstitutionally forced an antipsychotic drug upon him during trial. Because the Nevada courts failed to make findings sufficient to support forced administration of the drug, we reverse.

## I

During the early hours of November 20, 1987, Paul Wade was found dead in his Las Vegas apartment. An autopsy revealed that Wade died from multiple stab wounds, including wounds to the head, chest, and back. David Riggins was arrested for the killing 45 hours later.

A few days after being taken into custody, Riggins told Dr. R. Edward Quass, a private psychiatrist who treated patients at the Clark County Jail, about hearing voices in his head and having trouble sleeping. Riggins informed Dr. Quass that he had been successfully treated with Mellaril in the past. Mellaril is the trade name for thioridazine, an antipsychotic drug. After this consultation, Dr. Quass prescribed Mellaril at a level of 100 milligrams per day. Because Riggins continued to complain of voices and sleep problems in the following months, Dr. Quass gradually increased the Mellaril prescription to 800 milligrams per day. Riggins also received a prescription for Dilantin, an antiepileptic drug.

In January 1988, Riggins successfully moved for a determination of his competence to stand trial. App. 6. Three

Defense Lawyers by *David M. Eldridge;* and for Nevada Attorneys for Criminal Justice by *Kevin M. Kelly.*

Briefs of *amici curiae* were filed for the State of Louisiana et al. by *William J. Guste, Jr.,* Attorney General of Louisiana, and *M. Patricia Jones* and *Kathleen E. Petersen,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Charles M. Oberly III* of Delaware and *Michael E. Carpenter* of Maine; and for the American Psychiatric Association by *Richard G. Taranto* and *Joel I. Klein.*

court-appointed psychiatrists performed examinations during February and March, while Riggins was taking 450 milligrams of Mellaril daily. Dr. William O'Gorman, a psychiatrist who had treated Riggins for anxiety in 1982, and Dr. Franklin Master concluded that Riggins was competent to stand trial. The third psychiatrist, Dr. Jack Jurasky, found that Riggins was incompetent. The Clark County District Court determined that Riggins was legally sane and competent to stand trial, *id.*, at 13, so preparations for trial went forward.

In early June, the defense moved the District Court for an order suspending administration of Mellaril and Dilantin until the end of Riggins' trial. *Id.*, at 20. Relying on both the Fourteenth Amendment and the Nevada Constitution, Riggins argued that continued administration of these drugs infringed upon his freedom and that the drugs' effect on his demeanor and mental state during trial would deny him due process. Riggins also asserted that, because he would offer an insanity defense at trial, he had a right to show jurors his "true mental state." *Id.*, at 22. In response, the State noted that Nevada law prohibits the trial of incompetent persons, see Nev. Rev. Stat. § 178.400 (1989), and argued that the court therefore had authority to compel Riggins to take medication necessary to ensure his competence. App. 31–32.

On July 14, 1988, the District Court held an evidentiary hearing on Riggins' motion. At the hearing, Dr. Master "guess[ed]" that taking Riggins off medication would not noticeably alter his behavior or render him incompetent to stand trial. Record 412. Dr. Quass testified that, in his opinion, Riggins would be competent to stand trial even without the administration of Mellaril, but that the effects of Mellaril would not be noticeable to jurors if medication continued. *Id.*, at 443–445. Finally, Dr. O'Gorman told the court that Mellaril made the defendant calmer and more re-

laxed but that an excessive dose would cause drowsiness. *Id.*, at 464–466. Dr. O'Gorman was unable to predict how Riggins might behave if taken off antipsychotic medication, yet he questioned the need to give Riggins the high dose he was receiving. *Id.*, at 474–476. The court also had before it a written report in which Dr. Jurasky held to his earlier view that Riggins was incompetent to stand trial and predicted that if taken off Mellaril the defendant "would most likely regress to a manifest psychosis and become extremely difficult to manage." App. 19.

The District Court denied Riggins' motion to terminate medication with a one-page order that gave no indication of the court's rationale. *Id.*, at 49. Riggins continued to receive 800 milligrams of Mellaril each day through the completion of his trial the following November.

At trial, Riggins presented an insanity defense and testified on his own behalf. He indicated that on the night of Wade's death he used cocaine before going to Wade's apartment. Riggins admitted fighting with Wade, but claimed that Wade was trying to kill him and that voices in his head said that killing Wade would be justifiable homicide. A jury found Riggins guilty of murder with use of a deadly weapon and robbery with use of a deadly weapon. After a penalty hearing, the same jury set the murder sentence at death.

Riggins presented several claims to the Nevada Supreme Court, among them that forced administration of Mellaril denied him the ability to assist in his own defense and prejudicially affected his attitude, appearance, and demeanor at trial. This prejudice was not justified, Riggins said in his opening brief, because the State neither demonstrated a need to administer Mellaril nor explored alternatives to giving him 800 milligrams of the drug each day. Record 1020. Riggins amplified this claim in his reply brief, objecting that the State intruded upon his constitutionally protected lib-

erty interest in freedom from antipsychotic drugs without considering less intrusive options. Riggins argued:

> "In *United States v. Bryant*, 670 F. Supp. 840, 843 (Minn. 1987)[,] the court, in reference to medicating prisoners against their will, stated that 'courts have recognized a *protectable liberty interest* . . . in the freedom to avoid unwanted medication with such drugs.' The court in so stating cited *Bee v. Greaves*, 744 F. 2d 1387 (10th Cir. 1984)[,] which addressed the issue of medicating pre-trial detainees and stated that 'less restrictive alternatives, such as segregation or the use of less controversial drugs like tranquilizers or sedatives, should be ruled out before resorting to antipsychotic drugs.' In the case at bar, no less restrictive alternatives were utilized, considered or even proposed." Record 1070–1071 (emphasis in original).

The Nevada Supreme Court affirmed Riggins' convictions and death sentence. 107 Nev. 178, 808 P. 2d 535 (1991). With respect to administration of Mellaril, the court held that expert testimony presented at trial "was sufficient to inform the jury of the effect of the Mellaril on Riggins' demeanor and testimony." *Id.*, at 181, 808 P. 2d, at 538. Thus, although Riggins' demeanor was relevant to his insanity defense, the court held that denial of the defense's motion to terminate medication was neither an abuse of discretion nor a violation of Riggins' trial rights. In a concurring opinion, Justice Rose suggested that the District Court should have determined whether administration of Mellaril during trial was "absolutely necessary" by ordering a pretrial suspension of medication. *Id.*, at 185, 808 P. 2d, at 540 (concurring opinion). Justice Springer dissented, arguing that antipsychotic drugs may never be forced on a criminal defendant solely to allow prosecution. *Id.*, at 186, 808 P. 2d, at 541.

We granted certiorari, 502 U. S. 807 (1991), to decide whether forced administration of antipsychotic medication

during trial violated rights guaranteed by the Sixth and Fourteenth Amendments.

## II

The record in this case narrowly defines the issues before us. The parties have indicated that once the District Court denied Riggins' motion to terminate use of Mellaril, subsequent administration of the drug was involuntary. See, *e. g.*, Brief for Petitioner 6 (medication was "forced"); Brief for Respondent 14, 22, 28 (describing medication as "unwanted," "over objection," and "compelled"). This understanding accords with the determination of the Nevada Supreme Court. See 107 Nev., at 181; 808 P. 2d, at 537 (describing medication as "involuntary" and "forced"). Given the parties' positions on this point and the absence of any record evidence to the contrary, we adhere to the understanding of the State Supreme Court.

We also presume that administration of Mellaril was medically appropriate. Although defense counsel stressed that Riggins received a very high dose of the drug, at no point did he suggest to the Nevada courts that administration of Mellaril was medically improper treatment for his client.

Finally, the record is dispositive with respect to Riggins' Eighth Amendment claim that administration of Mellaril denied him an opportunity to show jurors his true mental condition at the sentencing hearing. Because this argument was presented neither to the Nevada Supreme Court nor in Riggins' petition for certiorari, we do not address it here.

With these considerations in mind, we turn to Riggins' core contention that involuntary administration of Mellaril denied him "a full and fair trial." Pet. for Cert. i. Our discussion in *Washington* v. *Harper*, 494 U. S. 210 (1990), provides useful background for evaluating this claim. In *Harper*, a prison inmate alleged that the State of Washington and various individuals violated his right to due process by giving him Mellaril and other antipsychotic drugs against his will. Although the inmate did not prevail, we agreed that

his interest in avoiding involuntary administration of antipsychotic drugs was protected under the Fourteenth Amendment's Due Process Clause. "The forcible injection of medication into a nonconsenting person's body," we said, "represents a substantial interference with that person's liberty." *Id.*, at 229. In the case of antipsychotic drugs like Mellaril, that interference is particularly severe:

> "The purpose of the drugs is to alter the chemical balance in a patient's brain, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that the drugs can have serious, even fatal, side effects. One such side effect identified by the trial court is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through use of the medication Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face. . . . [T]he proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe." *Id.*, at 229–230 (citations omitted).

Taking account of the unique circumstances of penal confinement, however, we determined that due process allows a

mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that "the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.*, at 227.

Under *Harper*, forcing antipsychotic drugs on a convicted prisoner is impermissible absent a finding of overriding justification and a determination of medical appropriateness. The Fourteenth Amendment affords at least as much protection to persons the State detains for trial. See *Bell* v. *Wolfish*, 441 U. S. 520, 545 (1979) ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners"); *O'Lone* v. *Estate of Shabazz*, 482 U. S. 342, 349 (1987) ("[P]rison regulations . . . are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights"). Thus, once Riggins moved to terminate administration of antipsychotic medication, the State became obligated to establish the need for Mellaril and the medical appropriateness of the drug.

Although we have not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings, Nevada certainly would have satisfied due process if the prosecution had demonstrated, and the District Court had found, that treatment with antipsychotic medication was medically appropriate and, considering less intrusive alternatives, essential for the sake of Riggins' own safety or the safety of others. See *Harper, supra,* at 225–226; cf. *Addington* v. *Texas*, 441 U. S. 418 (1979) (Due Process Clause allows civil commitment of individuals shown by clear and convincing evidence to be mentally ill and dangerous). Similarly, the State might have been able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins' guilt or innocence by using less intrusive means. See *Illinois* v. *Allen*, 397 U. S. 337, 347

(1970) (Brennan, J., concurring) ("Constitutional power to bring an accused to trial is fundamental to a scheme of 'ordered liberty' and prerequisite to social justice and peace"). We note that during the July 14 hearing Riggins did not contend that he had the right to be tried without Mellaril if its discontinuation rendered him incompetent. See Record 424–425, 496, 500. The question whether a competent criminal defendant may refuse antipsychotic medication if cessation of medication would render him incompetent at trial is not before us.

Contrary to the dissent's understanding, we do not "adopt a standard of strict scrutiny." *Post*, at 156. We have no occasion to finally prescribe such substantive standards as mentioned above, since the District Court allowed administration of Mellaril to continue without making *any* determination of the need for this course or *any* findings about reasonable alternatives. The court's laconic order denying Riggins' motion did not adopt the State's view, which was that continued administration of Mellaril was required to ensure that the defendant could be tried; in fact, the hearing testimony casts considerable doubt on that argument. See *supra*, at 130–131. Nor did the order indicate a finding that safety considerations or other compelling concerns outweighed Riggins' interest in freedom from unwanted antipsychotic drugs.

Were we to divine the District Court's logic from the hearing transcript, we would have to conclude that the court simply weighed the risk that the defense would be prejudiced by changes in Riggins' outward appearance against the chance that Riggins would become incompetent if taken off Mellaril, and struck the balance in favor of involuntary medication. See Record 502 ("[T]hat he was nervous and so forth . . . can all be brought out [through expert testimony]. And when you start weighing the consequences of taking him off his medication and possibly have him revert into an incompetent situation, I don't think that that is a good exper-

iment"). The court did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs.

This error may well have impaired the constitutionally protected trial rights Riggins invokes. At the hearing to consider terminating medication, Dr. O'Gorman suggested that the dosage administered to Riggins was within the toxic range, *id.*, at 483, and could make him "uptight," *id.*, at 484. Dr. Master testified that a patient taking 800 milligrams of Mellaril each day might suffer from drowsiness or confusion. *Id.*, at 416. Cf. Brief for American Psychiatric Association as *Amicus Curiae* 10–11 ("[I]n extreme cases, the sedation-like effect [of antipsychotic medication] may be severe enough (akinesia) to affect thought processes"). It is clearly possible that such side effects had an impact upon not just Riggins' outward appearance, but also the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel.

Efforts to prove or disprove actual prejudice from the record before us would be futile, and guesses whether the outcome of the trial might have been different if Riggins' motion had been granted would be purely speculative. We accordingly reject the dissent's suggestion that Riggins should be required to demonstrate how the trial would have proceeded differently if he had not been given Mellaril. See *post*, at 149–150. Like the consequences of compelling a defendant to wear prison clothing, see *Estelle* v. *Williams*, 425 U. S. 501, 504–505 (1976), or of binding and gagging an accused during trial, see *Allen, supra*, at 344, the precise consequences of forcing antipsychotic medication upon Riggins cannot be shown from a trial transcript. What the testimony of doctors who examined Riggins establishes, and what we will not ignore, is a strong possibility that Riggins' defense was impaired due to the administration of Mellaril.

We also are persuaded that allowing Riggins to present expert testimony about the effect of Mellaril on his de-

meanor did nothing to cure the possibility that the substance of his own testimony, his interaction with counsel, or his comprehension at trial were compromised by forced administration of Mellaril. Even if (as the dissent argues, *post,* at 147–149) the Nevada Supreme Court was right that expert testimony allowed jurors to assess Riggins' demeanor fairly, an unacceptable risk of prejudice remained. See 107 Nev., at 181, 808 P. 2d, at 537–538.

To be sure, trial prejudice can sometimes be justified by an essential state interest. See *Holbrook* v. *Flynn,* 475 U. S. 560, 568–569 (1986); *Allen, supra,* at 344 (binding and gagging the accused permissible only in extreme situations where it is the "fairest and most reasonable way" to control a disruptive defendant); see also *Williams, supra,* at 505 (compelling defendants to wear prison clothing at trial furthers no essential state policy). Because the record contains no finding that might support a conclusion that administration of antipsychotic medication was necessary to accomplish an essential state policy, however, we have no basis for saying that the substantial probability of trial prejudice in this case was justified.

The judgment of the Nevada Supreme Court is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring in the judgment.

The medical and pharmacological data in the *amicus* briefs and other sources indicate that involuntary medication with antipsychotic drugs poses a serious threat to a defendant's right to a fair trial. In the case before us, there was no hearing or well-developed record on the point, and the whole subject of treating incompetence to stand trial by drug medication is somewhat new to the law, if not to medicine. On the sparse record before us, we cannot give full consideration to the issue. I file this separate opinion, however, to express

my view that absent an extraordinary showing by the State, the Due Process Clause prohibits prosecuting officials from administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent for trial, and to express doubt that the showing can be made in most cases, given our present understanding of the properties of these drugs.

At the outset, I express full agreement with the Court's conclusion that one who was medicated against his will in order to stand trial may challenge his conviction. When the State commands medication during the pretrial and trial phases of the case for the avowed purpose of changing the defendant's behavior, the concerns are much the same as if it were alleged that the prosecution had manipulated material evidence. See *Brady* v. *Maryland*, 373 U. S. 83, 87 (1963) (suppression by the prosecution of material evidence favorable to the accused violates due process); *Arizona* v. *Youngblood*, 488 U. S. 51, 58 (1988) (bad-faith failure to preserve potentially useful evidence constitutes a due process violation). I cannot accept the premise of JUSTICE THOMAS' dissent that the involuntary medication order comprises some separate procedure, unrelated to the trial and foreclosed from inquiry or review in the criminal proceeding itself. To the contrary, the allegations pertain to the State's interference with the trial. Thus, review in the criminal proceeding is appropriate.

I also agree with the majority that the State has a legitimate interest in attempting to restore the competence of otherwise incompetent defendants. Its interest derives from the State's right to bring an accused to trial and from our holding in *Pate* v. *Robinson*, 383 U. S. 375, 378 (1966), that conviction of an incompetent defendant violates due process. Unless a defendant is competent, the State cannot put him on trial. Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial, including the right to effective assistance of coun-

sel, the rights to summon, to confront, and to cross-examine witnesses, and the right to testify on one's own behalf or to remain silent without penalty for doing so. *Drope* v. *Missouri*, 420 U. S. 162, 171–172 (1975). Although the majority is correct that this case does not require us to address the question whether a defendant may waive his right to be tried while competent, in my view a general rule permitting waiver would not withstand scrutiny under the Due Process Clause, given our holdings in *Pate* and *Drope*. A defendant's waiver of the right to be tried while competent would cast doubt on his exercise or waiver of all subsequent rights and privileges through the whole course of the trial.

The question is whether the State's interest in conducting the trial allows it to ensure the defendant's competence by involuntary medication, assuming of course there is a sound medical basis for the treatment. The Court's opinion will require further proceedings on remand, but there seems to be little discussion about what is to be considered. The Court's failure to address these issues is understandable in some respects, for it was not the subject of briefing or argument; but to underscore my reservations about the propriety of involuntary medication for the purpose of rendering the defendant competent, and to explain what I think ought to be express qualifications of the Court's opinion, some discussion of the point is required.

This is not a case like *Washington* v. *Harper*, 494 U. S. 210 (1990), in which the purpose of the involuntary medication was to ensure that the incarcerated person ceased to be a physical danger to himself or others. The inquiry in that context is both objective and manageable. Here the purpose of the medication is not merely to treat a person with grave psychiatric disorders and enable that person to function and behave in a way not dangerous to himself or others, but rather to render the person competent to stand trial. It is the last part of the State's objective, medicating the person for the purpose of bringing him to trial, that causes most

serious concern.   If the only question were whether some bare level of functional competence can be induced, that would be a grave matter in itself, but here there are even more far reaching concerns.   The avowed purpose of the medication is not functional competence, but competence to stand trial.   In my view elementary protections against state intrusion require the State in every case to make a showing that there is no significant risk that the medication will impair or alter in any material way the defendant's capacity or willingness to react to the testimony at trial or to assist his counsel.   Based on my understanding of the medical literature, I have substantial reservations that the State can make that showing.   Indeed, the inquiry itself is elusive, for it assumes some baseline of normality that experts may have some difficulty in establishing for a particular defendant, if they can establish it at all.   These uncertainties serve to underscore the difficult terrain the State must traverse when it enters this domain.

To make these concerns concrete, the effects of antipsychotic drugs must be addressed.   First introduced in the 1950's, antipsychotic drugs such as Mellaril have wide acceptance in the psychiatric community as an effective treatment for psychotic thought disorders.   See American Psychiatric Press Textbook of Psychiatry 770–774 (J. Talbott, R. Hales, & S. Yodofsky eds. 1988) (Textbook of Psychiatry); Brief for American Psychiatric Association as *Amicus Curiae* 6–7. The medications restore normal thought processes by clearing hallucinations and delusions.   Textbook of Psychiatry 774.   See also Brief for American Psychiatric Association as *Amicus Curiae* 9 ("The mental health produced by antipsychotic medication is no different from, no more inauthentic or alien to the patient than, the physical health produced by other medications, such as penicillin for pneumonia").   For many patients, no effective alternative exists for treatment of their illnesses.   *Id.*, at 7, and n. 3.

Although these drugs have changed the lives of psychiatric patients, they can have unwanted side effects. We documented some of the more serious side effects in *Washington* v. *Harper, supra,* at 229–230, and they are mentioned again in the majority opinion. More relevant to this case are side effects that, it appears, can compromise the right of a medicated criminal defendant to receive a fair trial. The drugs can prejudice the accused in two principal ways: (1) by altering his demeanor in a manner that will prejudice his reactions and presentation in the courtroom, and (2) by rendering him unable or unwilling to assist counsel.

It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table. This assumption derives from the right to be present at trial, which in turn derives from the right to testify and rights under the Confrontation Clause. *Taylor* v. *United States,* 414 U. S. 17, 19 (1973) *(per curiam).* At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial. If the defendant takes the stand, as Riggins did, his demeanor can have a great bearing on his credibility and persuasiveness, and on the degree to which he evokes sympathy. The defendant's demeanor may also be relevant to his confrontation rights. See *Coy* v. *Iowa,* 487 U. S. 1012, 1016–1020 (1988) (emphasizing the importance of the face-to-face encounter between the accused and the accuser).

The side effects of antipsychotic drugs may alter demeanor in a way that will prejudice all facets of the defense. Serious due process concerns are implicated when the State manipulates the evidence in this way. The defendant may be restless and unable to sit still. Brief for American Psychiatric Association as *Amicus Curiae* 10. The drugs can induce

a condition called parkinsonism, which, like Parkinson's disease, is characterized by tremor of the limbs, diminished range of facial expression, or slowed functions, such as speech. *Ibid.* Some of the side effects are more subtle. Antipsychotic drugs such as Mellaril can have a "sedation-like effect" that in severe cases may affect thought processes. *Ibid.* At trial, Dr. Jurasky testified that Mellaril has "a tranquilizer effect." Record 752. See also *ibid.* ("If you are dealing with someone very sick then you may prescribe up to 800 milligrams which is the dose he had been taking which is very, very high. I mean you can tranquilize an elephant with 800 milligrams"). Dr. Jurasky listed the following side effects of large doses of Mellaril: "Drowsiness, constipation, perhaps lack of alertness, changes in blood pressure. . . . Depression of the psychomotor functions. If you take a lot of it you become stoned for all practical purposes and can barely function." *Id.,* at 753.

These potential side effects would be disturbing for any patient; but when the patient is a criminal defendant who is going to stand trial, the documented probability of side effects seems to me to render involuntary administration of the drugs by prosecuting officials unacceptable absent a showing by the State that the side effects will not alter the defendant's reactions or diminish his capacity to assist counsel. As the American Psychiatric Association points out:

> "By administering medication, the State may be creating a prejudicial negative demeanor in the defendant— making him look nervous and restless, for example, or so calm or sedated as to appear bored, cold, unfeeling, and unresponsive. . . . That such effects may be subtle does not make them any less real or potentially influential." Brief for American Psychiatric Association as *Amicus Curiae* 13.

As any trial attorney will attest, serious prejudice could result if medication inhibits the defendant's capacity to react

and respond to the proceedings and to demonstrate remorse or compassion. The prejudice can be acute during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies. See Geimer & Amsterdam, Why Jurors Vote Life or Death: Operative Factors in Ten Florida Death Penalty Cases, 15 Am. J. Crim. L. 1, 51–53 (1987–1988).

Concerns about medication extend also to the issue of cooperation with counsel. We have held that a defendant's right to the effective assistance of counsel is impaired when he cannot cooperate in an active manner with his lawyer. *Massiah* v. *United States,* 377 U. S. 201 (1964); *Geders* v. *United States,* 425 U. S. 80 (1976) (trial court order directing defendant not to consult with his lawyer during an overnight recess held to deprive him of the effective assistance of counsel). The defendant must be able to provide needed information to his lawyer and to participate in the making of decisions on his own behalf. The side effects of antipsychotic drugs can hamper the attorney-client relation, preventing effective communication and rendering the defendant less able or willing to take part in his defense. The State interferes with this relation when it administers a drug to dull cognition. See Brief for National Association of Criminal Defense Lawyers as *Amicus Curiae* 42 ("[T]he chemical flattening of a person's will can also lead to the defendant's loss of self-determination undermining the desire for self-preservation which is necessary to engage the defendant in his own defense in preparation for his trial").

It is well established that the defendant has the right to testify on his own behalf, a right we have found essential to our adversary system. *In re Oliver,* 333 U. S. 257, 273 (1948). We have found the right implicit as well in the Com-

pulsory Process Clause of the Sixth Amendment. *Rock* v. *Arkansas*, 483 U. S. 44 (1987). In *Rock*, we held that a state rule excluding all testimony aided or refreshed by hypnosis violated the defendant's constitutional right to take the stand in her own defense. We observed that barring the testimony would contradict not only the right of the accused to conduct her own defense, but also her right to make this defense in person: " 'It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." ' " *Id.*, at 52, quoting *Faretta* v. *California*, 422 U. S. 806, 819 (1975). We gave further recognition to the right of the accused to testify in his or her own words, and noted that this in turn was related to the Fifth Amendment choice to speak "in the unfettered exercise of his own will." *Rock, supra,* at 53. In my view medication of the type here prescribed may be for the very purpose of imposing constraints on the defendant's own will, and for that reason its legitimacy is put in grave doubt.

If the State cannot render the defendant competent without involuntary medication, then it must resort to civil commitment, if appropriate, unless the defendant becomes competent through other means. If the defendant cannot be tried without his behavior and demeanor being affected in this substantial way by involuntary treatment, in my view the Constitution requires that society bear this cost in order to preserve the integrity of the trial process. The state of our knowledge of antipsychotic drugs and their side effects is evolving and may one day produce effective drugs that have only minimal side effects. Until that day comes, we can permit their use only when the State can show that involuntary treatment does not cause alterations raising the concerns enumerated in this separate opinion.

With these observations, I concur in the judgment reversing the conviction.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins except as to Part. II–A, dissenting.

Petitioner David Edward Riggins killed Paul William Wade by stabbing him 32 times with a knife. He then took cash, drugs, and other items from Wade's home. A Nevada jury convicted Riggins of first-degree murder and robbery with a deadly weapon and sentenced him to death. The Nevada Supreme Court affirmed. 107 Nev. 178, 808 P. 2d 535 (1991). This Court reverses the conviction, holding that Nevada unconstitutionally deprived Riggins of his liberty interest in avoiding unwanted medication by compelling him to take an antipsychotic drug. I respectfully dissent.

The Court's opinion, in my view, conflates two distinct questions: whether Riggins had a full and fair criminal trial and whether Nevada improperly forced Riggins to take medication. In this criminal case, Riggins is asking, and may ask, only for the reversal of his conviction and sentence. He is not seeking, and may not seek, an injunction to terminate his medical treatment or damages for an infringement of his personal rights. I agree with the positions of the majority and concurring opinions in the Nevada Supreme Court: Even if the State truly forced Riggins to take medication, and even if this medication deprived Riggins of a protected liberty interest in a manner actionable in a different legal proceeding, Riggins nonetheless had the fundamentally fair criminal trial required by the Constitution. I therefore would affirm his conviction.

I

Riggins contended in the Nevada Supreme Court that he did not have a "'full and fair' trial" for two reasons, the first relating to exclusion of evidence of his mental condition and the second concerning his ability to assist in his defense. Record 1018. To the extent that Riggins' arguments below involved federal constitutional issues, I believe that the Nevada Supreme Court correctly rejected them.

## A

Riggins first argued that the trial court improperly prevented him from presenting relevant evidence of his demeanor. As the Court notes, Riggins suffers from a mental illness and raised insanity as a defense at trial. When Riggins killed Wade, he was not using any antipsychotic medication. During his trial, however, Riggins was taking large doses of the antipsychotic drug Mellaril. Riggins believed that this drug would make his appearance at trial different from his appearance when he attacked Wade and that this difference might cause the jury to misjudge his sanity. To show his mental condition as it existed at the time of the crime, Riggins requested permission to appear before the jury in an unmedicated state. App. 20–24, 42–47. The trial court denied the request, and the Nevada Supreme Court affirmed.

This Court has no power to decide questions concerning the admissibility of evidence under Nevada law. *Estelle* v. *McGuire*, 502 U. S. 62, 67–68 (1991). We therefore may conduct only a limited review of a Nevada court's decision to exclude a particular form of demeanor evidence. Except in cases involving a violation of a specific constitutional provision such as the Confrontation Clause, see, *e. g., Ohio* v. *Roberts*, 448 U. S. 56 (1980), this Court may not reverse a state "trial judge's action in the admission of evidence" unless the evidentiary ruling "so infuse[s] the trial with unfairness as to deny due process of law." *Lisenba* v. *California*, 314 U. S. 219, 228 (1941). See also *Marshall* v. *Lonberger*, 459 U. S. 422, 438, n. 6 (1983); *Burgett* v. *Texas*, 389 U. S. 109, 113–114 (1967). In this case, I see no basis for concluding that Riggins had less than a full and fair trial.

The Court declines to decide whether Mellaril actually affected Riggins' appearance. On the basis of some pretrial psychiatric testimony it speculates only that Riggins might have looked less uptight, drowsy, or confused if he had not taken the drug. *Ante,* at 137. Other evidence casts doubt

on this possibility. At least one psychiatrist believed that a jury would not "be able to notice whether or not [Riggins] was on Mellaril as compared to the period of the time when he was not medicated by that drug." Record 445. Yet, even if Mellaril noticeably affected Riggins' demeanor, the Court fails to explain why the medication's effects rendered Riggins' trial fundamentally unfair.

The trial court offered Riggins the opportunity to prove his mental condition as it existed at the time of the crime through testimony instead of his appearance in court in an unmedicated condition. Riggins took advantage of this offer by explaining to the jury the history of his mental health, his usage of Mellaril, and the possible effects of Mellaril on his demeanor. *Id.*, at 739–740. Riggins also called Dr. Jack A. Jurasky, a psychiatrist, who testified about Riggins' condition after his arrest and his likely mental state at the time of the crime. *Id.*, at 747–748. Dr. Jurasky also explained Riggins' use of Mellaril and how it might be affecting him. *Id.*, at 752–753, 760–761.

The Nevada Supreme Court concluded that this "testimony was sufficient to inform the jury of the effect of the Mellaril on Riggins' demeanor and testimony." 107 Nev., at 181, 808 P. 2d, at 538. Its analysis comports with that of other state courts that also have held that expert testimony may suffice to clarify the effects of an antipsychotic drug on a defendant's apparent demeanor. See *State* v. *Law*, 270 S. C. 664, 673, 244 S. E. 2d 302, 306 (1978); *State* v. *Jojola*, 89 N. M. 489, 493, 553 P. 2d 1296, 1300 (1976). Cf. *In re Pray*, 133 Vt. 253, 257–258, 336 A. 2d 174, 177 (1975) (reversing a conviction because no expert testimony explained how antipsychotic medicine affected the defendant's appearance). Having reviewed the record as a whole, I see no reason to disturb the conclusion of the Nevada Supreme Court. On the facts of this case, Riggins' inability to introduce evidence of his mental condition as he desired did not render his trial fundamentally unfair. See *Rock* v. *Arkansas*, 483

U. S. 44, 55, n. 11 (1987); *id.*, at 64–65 (REHNQUIST, C. J., dissenting).

## B

Riggins also argued in the Nevada Supreme Court, although not in his briefs to this Court, that he did not have a " 'full and fair' trial" because Mellaril had side effects that interfered with his ability to participate in his defense. Record 1018. He alleged, in particular, that the drug tended to limit his powers of perception. The Court accepts this contention, stating: "It is clearly *possible* that such side effects had an impact upon . . . the content of his testimony on direct or cross examination, his ability to follow the proceedings, or the substance of his communication with counsel." *Ante*, at 137 (emphasis added). I disagree. We cannot conclude that Riggins had less than a full and fair trial merely because of the possibility that Mellaril had side effects.

All criminal defendants have a right to a full and fair trial, and a violation of this right may occur if a State tries a defendant who lacks a certain ability to comprehend or participate in the proceedings. We have said that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial," *Spencer* v. *Texas*, 385 U. S. 554, 563–564 (1967), and have made clear that "conviction of an accused person while he is legally incompetent violates due process," *Pate* v. *Robinson*, 383 U. S. 375, 378 (1966).

Riggins has no claim of legal incompetence in this case. The trial court specifically found him competent while he was taking Mellaril under a statute requiring him to have "sufficient mentality to be able to understand the nature of the criminal charges against him, and . . . to aid and assist his counsel in the defense interposed upon the trial." Nev. Rev. Stat. § 178.400(2) (1989). Riggins does not assert that due process imposes a higher standard.

The record does not reveal any other form of unfairness relating to the purported side effects of Mellaril. Riggins has failed to allege specific facts to support his claim that he

could not participate effectively in his defense. He has not stated how he would have directed his counsel to examine or cross-examine witnesses differently. He has not identified any testimony or instructions that he did not understand. The record, moreover, does not even support his assertion that Mellaril made him worse off. As Justice Rose noted in his concurring opinion below: "Two psychiatrists who had prescribed Mellaril for Riggins, Dr. Quass and Dr. O'Gorman, testified that they believed it was helpful to him. Additional psychiatric testimony established that Mellaril may have increased Riggins' cognitive ability . . . ." 107 Nev., at 185, 808 P. 2d, at 540. See also *State* v. *Hayes*, 118 N. H. 458, 461, 389 A. 2d 1379, 1381 (1978) (holding a defendant's perception adequate because "[a]ll the expert evidence support[ed] the conclusion that the medication ha[d] a beneficial effect on the defendant's ability to function").[1] Riggins' competence, moreover, tends to confirm that he had a fair trial. See *State* v. *Jojola, supra,* at 492, 553 P. 2d, at 1299 (presuming, absent other evidence, that the side effects of an antipsychotic drug did not render a competent defendant unable to participate fully in his trial). I thus see no basis for reversing the Nevada Supreme Court.

## II

Riggins also argues for reversal on the basis of our holding in *Washington* v. *Harper,* 494 U. S. 210, 221 (1990), that the Due Process Clause protects a substantive "liberty interest" in avoiding unwanted medication. Riggins asserts that Nevada unconstitutionally deprived him of this liberty interest by forcing him to take Mellaril. The Court agrees, ruling

---

[1] We previously have noted that "'[p]sychotropic medication is widely accepted within the psychiatric community as an extraordinarily effective treatment for both acute and chronic psychoses, particularly schizophrenia.'" *Washington* v. *Harper,* 494 U. S. 210, 226, n. 9 (1990) (quoting Brief for American Psychiatric Association et al. as *Amici Curiae,* O. T. 1989, No. 88–599, pp. 10–11).

that "the Nevada courts failed to make findings sufficient to support forced administration of the drug" in this case. *Ante*, at 129. I consider reversal on this basis improper.

## A

Riggins may not complain about a deprivation of the liberty interest that we recognized in *Harper* because the record does not support his version of the facts. Shortly after his arrest, as the Court notes, Riggins told a psychiatrist at his jail that he was hearing voices and could not sleep. The psychiatrist prescribed Mellaril. When the prescription did not eliminate the problem, Riggins sought further treatment and the psychiatrist increased the dosage. Riggins thus began taking the drug voluntarily. *Ante*, at 129.

The Court concludes that the medication became involuntary when the trial court denied Riggins' motion for permission not to take the drug during the trial. *Ante*, at 133. I disagree. Although the court denied Riggins' motion, it did not order him to take any medication.[2] Moreover, even though Riggins *alleges* that the *state physicians* forced him to take the medication after the court's order, the record contains no finding of fact with respect to this allegation. The Court admits that it merely assumes that the physicians drugged him, and attempts to justify its assumption by observing that the Nevada Supreme Court also assumed that involuntary medication occurred. *Ibid.* The Nevada Supreme Court, however, may have made its assumption for the purpose of argument; the assumption, in its view, did

---

[2] Riggins' counsel confirmed this interpretation of the order at oral argument:

"QUESTION: . . . [D]id the court ever go further than saying I will not order the State to stop administering the medication? . . . It simply said . . . I won't intervene and enjoin the administration of this medication[.]

"MR. YAMPOLSKY: Yes . . . .

"QUESTION: So if [Riggins] had then said, well, I'm not going to take it, he wouldn't be in violation of the court order? . . .

"Mr. YAMPOLSKY: Apparently not." Tr. of Oral Arg. 10.

not change the result of the case. The Court cannot make the same assumption if it requires reversal of Riggins' conviction.

Riggins also cannot complain about a violation of *Harper* because he did not argue below for reversal of his conviction on the ground that Nevada had deprived him of a liberty interest. Riggins consistently maintained in the Nevada courts that he did not have a "full and fair trial" because the medication deprived him of the opportunity to present his demeanor to the jury and to participate in his defense. App. 20–24 (trial court motion); *id.*, at 42–47 (trial court reply); Record 1018–1021 (appellate brief); *id.*, at 1068–1071 (appellate reply brief). As counsel for Nevada put it at oral argument: "The way this issue was initially presented to the trial court was really a question of trial strategy. There was never an indication in this case that Mr. Riggins was a Harper-type defendant who did not want to be medicated." Tr. of Oral Arg. 23.[3]

Because the claims that Riggins raised below have no merit, Riggins has altered his theory of the case. The Court, therefore, should not condemn the Nevada courts because they "did not acknowledge the defendant's liberty interest in freedom from unwanted antipsychotic drugs." *Ante,* at 137. The Nevada courts had no reason to consider an argument that Riggins did not make. We have said quite recently that "[i]n reviewing the judgments of state courts under the jurisdictional grant of 28 U. S. C. § 1257, the Court has, with very rare exceptions, refused to consider petition-

---

[3] Riggins noted in his reply brief before the Nevada Supreme Court that the courts in *United States* v. *Bryant,* 670 F. Supp. 840, 843 (Minn. 1987), and *Bee* v. *Greaves,* 744 F. 2d 1387 (CA10 1984), had recognized a personal liberty interest in avoiding unwanted medication. Record 1070–1071. Yet, Riggins never asked for reversal because of a deprivation of this interest. He argued for reversal in that brief only on grounds that the medication "violated [his] right to a 'full and fair' trial because it denied him the ability to assist in his defense, and prejudiced his demeanor, attitude, and appearance to the jury." *Id.*, at 1068.

ers' claims that were not raised or addressed below." *Yee* v. *Escondido,* 503 U. S. 519, 533 (1992). Although "we have expressed inconsistent views as to whether this rule is jurisdictional or prudential in cases arising from state courts," *ibid.,* the Court does not attempt to justify its departure here.

Finally, we did not grant certiorari to determine whether the Nevada courts had made the findings required by *Harper* to support forced administration of a drug. We took this case to decide "[w]hether forced medication during trial violates a defendant's constitutional right to a full and fair trial." Pet. for Cert. The Court declines to answer this question one way or the other, stating only that a violation of *Harper* "may well have impaired the constitutionally protected trial rights Riggins invokes." *Ante,* at 137. As we have stated, "we ordinarily do not consider questions outside those presented in the petition for certiorari." *Yee* v. *Escondido, supra,* at 535. I believe that we should refuse to consider Riggins' *Harper* argument.

### B

The *Harper* issue, in any event, does not warrant reversal of Riggins' conviction. The Court correctly states that Riggins, as a detainee awaiting trial, had at least the same liberty interest in avoiding unwanted medication that the inmate had in *Harper.* This case, however, differs from *Harper* in a very significant respect. When the inmate in *Harper* complained that physicians were drugging him against his will, he sought damages and an injunction against future medication in a civil action under 42 U. S. C. § 1983. See 494 U. S., at 217. Although Riggins also complains of forced medication, he is seeking a reversal of his criminal conviction. I would not expand *Harper* to include this remedy.

We have held that plaintiffs may receive civil remedies for all manner of constitutional violations under § 1983. See

*Dennis* v. *Higgins,* 498 U. S. 439, 443–451 (1991). This Court, however, has reversed criminal convictions only on the basis of two kinds of constitutional deprivations: those "which occu[r] during the presentation of the case" to the trier of fact, and those which cause a "structural defect affecting the framework" of the trial. *Arizona* v. *Fulminante,* 499 U. S. 279, 307, 310 (1991). The Court does not reveal why it considers a deprivation of a liberty interest in avoiding unwanted medication to fall into either category of reversible error. Even if Nevada failed to make the findings necessary to support forced administration of Mellaril, this failure, without more, would not constitute a trial error or a flaw in the trial mechanism. See 107 Nev., at 185, 808 P. 2d, at 540 (Rose, J., concurring). Although Riggins might be entitled to other remedies, he has no right to have his conviction reversed.[4]

---

[4] A State, however, might violate a defendant's due process right to a fundamentally fair trial if its administration of medication were to *diminish* substantially the defendant's mental faculties during the trial, even if he were not thereby rendered incompetent. See 3 E. Coke, Institutes *34 (1797) ("If felons come in judgement to answer, . . . they shall be out of irons, and all manner of bonds, so that their pain shall not take away any manner of reason, nor them constrain to answer, but at their free will"); Resolutions of the Judges upon the Case of the Regicides, Kelyng's Report of Divers Cases in Pleas of the Crown 10 (1708) (Old Bailey 1660) ("It was resolved that when Prisoners come to the Bar to be tryed, their Irons ought to be taken off, so that they be not in any Torture while they make their defense, be their Crime never so great"), reprinted in 5 How. St. Tr. 971, 979–980 (1816); *Trial of Christopher Layer,* 16 How. St. Tr. 94, 100 (1812) [K. B. 1722] ("[T]he authority is that [the defendant] is not to be 'in vinculis' during his trial, but should be so far free, that he should have the use of his reason, and all advantages to clear his innocence"); see also *State* v. *Williams,* 18 Wash. 47, 49–51, 50 P. 580, 581 (1897) ("'[T]he condition of the prisoner in shackles may, to some extent, deprive him of the free and calm use of all his faculties'") (quoting *State* v. *Kring,* 64 Mo. 591 (1877)). Riggins has not made (much less proved) any such allegation in this Court; indeed, the record indicates that Riggins' mental capacity was *enhanced* by his administration of Mellaril.

We applied a similar analysis in *Estelle* v. *Williams*, 425 U. S. 501 (1976). In that case, a prisoner challenged his conviction on grounds that the State had required him to wear prison garb before the jury. In reviewing the challenge, we did not ask whether the State had violated some personal right of the defendant to select his attire. Instead, we considered only whether the prison clothing had denied him a "fair trial" by making his appearance less favorable to the jury. *Id.*, at 503. Although we ultimately declined to reach the merits because the prisoner had waived the issue at trial, *id.*, at 512, we observed that lower courts had held that "a showing of actual prejudice must be made by a defendant seeking to have his conviction overturned on this ground," *id.*, at 504, n. 1. In my view, just as the validity of the conviction in *Estelle* v. *Williams* would depend on whether the prisoner had a fair trial, so does the validity of Riggins' conviction.

The need for requiring actual unfairness in this case (either in the form of a structural defect or an error in the presentation of evidence) becomes apparent when one considers how the Court might apply its decision to other cases. A State could violate *Harper* by forcibly administering *any* kind of medication to a criminal defendant. Yet, the Court surely would not reverse a criminal conviction for a *Harper* violation involving medications such as penicillin or aspirin. Perhaps Mellaril, in general, has a greater likelihood of affecting a person's appearance and powers of perceptions than these substances. As noted above, however, we have no indication in this case, considering the record as a whole, that Mellaril unfairly prejudiced Riggins.

I do not mean in any way to undervalue the importance of a person's liberty interest in avoiding forced medication or to suggest that States may drug detainees at their whim. Under *Harper*, detainees have an interest in avoiding unwanted medication that the States must respect. In appropriate instances, detainees may seek damages or injunctions

against further medication in civil actions either under
§ 1983, as in *Harper*, or under state law. Yet, when this
Court reviews a state-court criminal conviction of a defend-
ant who has taken medication, it cannot undo any violation
that already has occurred or punish those responsible. It
may determine only whether the defendant received a
proper trial, free of the kinds of reversible errors that we
have recognized. Because Riggins had a full and fair trial
in this case, I would affirm the Nevada Supreme Court.

### C

For the foregoing reasons, I find it unnecessary to address
the precise standards governing the forced administration of
drugs to persons such as Riggins. Whether or not Nevada
violated these standards, I would affirm Riggins' conviction.
I note, however, that the Court's discussion of these stand-
ards poses troubling questions. Although the Court pur-
ports to rely on *Washington* v. *Harper*, the standards that it
applies in this case differ in several respects.

The Court today, for instance, appears to adopt a standard
of strict scrutiny. It specifically faults the trial court for
failing to find either that the "continued administration of
Mellaril was *required* to ensure that the defendant could be
tried," *ante*, at 136 (emphasis added), or that "other *compel-
ling* concerns outweighed Riggins' interest in freedom from
unwanted antipsychotic drugs," *ibid.* (emphasis added).
We specifically rejected this high standard of review in
*Harper*. In that case, the Washington Supreme Court had
held that state physicians could not administer medication
to a prisoner without showing that it "was both necessary
and effective for furthering a compelling state interest."
494 U. S., at 218. We reversed, holding that the state court
"erred in refusing to apply the standard of reasonableness."
*Id.*, at 223.

The Court today also departs from *Harper* when it says
that the Nevada Supreme Court erred by not "considering

less intrusive alternatives." *Ante*, at 135. The Court presumably believes that Nevada could have treated Riggins with smaller doses of Mellaril or with other kinds of therapies. In *Harper*, however, we imposed no such requirement. In fact, we specifically ruled that "[t]he alternative means proffered by [the prisoner] for accommodating his interest in rejecting the forced administration of antipsychotic drugs do not demonstrate the invalidity of the State's policy." 494 U. S., at 226.

This case differs from *Harper* because it involves a pretrial detainee and not a convicted prisoner. The standards for forcibly medicating inmates well may differ from those for persons awaiting trial. The Court, however, does not rely on this distinction in departing from *Harper*; instead, it purports to be applying *Harper* to detainees. *Ante*, at 135. Either the Court is seeking to change the *Harper* standards or it is adopting different standards for detainees without stating its reasons. I cannot accept either interpretation of the Court's opinion. For all of these reasons, I respectfully dissent.