Springer, J.,
dissenting:
Before getting into the legal issues in this case, I want to state the positions of the two parties to this case as I see them.
The State sees a vicious and violent criminal trying to claim innocence by reason of insanity and trying now to evade prosecution by reason of his not being competent to stand trial.
The State understandably is interested in bringing this man to justice and says, in effect, that even if he has suffered from mental illness, he no longer does. By taking a few pills, Riggins can be made sane and kept sane simply by taking these pills. Why on earth, the prosecutors say, should Riggins be allowed to lapse into his naturally insane state and thus avoid bringing this case to a speedy conclusion?
The State sees no reason why Riggins should not be maintained, voluntarily or involuntarily, on a “medication” that will keep him “well” until the State gets through with him.
Riggins really does not have much to say — he has been psychotic and in and out of mental institutions for many years. After his arrest, the State immediately placed Riggins in a mental institution for the “criminally insane.”
Riggins underwent “treatment” during his post-arrest custody; and as a result of the drugs he was given, his hallucinations diminished; and by reason of taking “major tranquilizers,” Rig-gins became very tranquil and no longer agitated, violent and homicidal.
Riggins, through his attorney, requested that if he was going to be tried for murder, the State should no longer be permitted to force the major tranquilizers upon him. His reasons for requesting an end to the forced-drugging are:
1. The drugs put him in a stuporous condition that made it hard for him to work with his attorney.
*969 2. The drugs put him in a mental state that was radically different from the condition that he was in at the time the homicide took place. In other words, he was a different “exhibit” under the influence of drugs than he would have been without the drugs.
3. It is a violation of his constitutional due process rights to force medication upon him, especially drugs with mind-altering potentialities.
I am sympathetic to the State’s position: If we have the medical technology available to make an insane person sane, why should we not use that technology in order to bring that synthetically sane person to justice? Nevertheless, when I balance the need to bring insane persons to justice against the ignominy of forcing mind-altering drugs down the throats of persons who are presumed to be innocent, I opt in favor of the rights of the individual as against the rights of the State.
The United States Supreme Court has reversed Riggins’ conviction “[b]ecause the Nevada courts failed to make findings sufficient to support forced administration of the drug,” Mellaril.[1] Riggins v. Nevada, _ U.S. _, _, 112 S.Ct. 1810, 1811 (1992). The Supreme Court perceived that there was a “substantial probability of trial prejudice” inherent in forcing mind-altering drugs upon a person accused of a crime but, nevertheless, implied that certain findings “might support a conclusion that administration of antipsychotic drugs was necessary to accomplish an essential state policy.” Id. at _, 112 S.Ct. at 1817 (emphasis added). One finding that the Supreme Court thinks might support a conclusion that forced-drugging was “necessary” to accomplish an “essential state policy” is a finding that drugs were “essential for the sake of Riggins own safety or the safety of others.” Id. at _, 112 S.Ct. at 1815. The other possible “essential state policy” involved here is the state’s imperative to bring the criminally accused to justice. The “state might ... be able to justify medically appropriate, involuntary treatment with the drug by establishing that it could not obtain an adjudication of Riggins’ guilt or innocence by using less intrusive means.” Id. at _, 112 S.Ct. at 1815.
The Supreme Court has told us that when forced drugging of a criminal defendant is employed by the state, there is a probability of prejudice and that this prejudice “might” be overcome by the *970 state’s showing and the trial court’s finding either that forced-drugging was required for safety or for making the accused sane enough to be tried. The Supreme Court has also told us that there is a “liberty interest in freedom from unwanted antipsychotic drugs”[2] and that the burden of proof is on the state in these matters. The state is “obligated to establish the need for Mellaril and the medical appropriateness of the drug.” Id. at _, 112 S.Ct. at 1815.
What the Supreme Court has not told us is how forced drugging is to be justified either by the necessity for safety or the necessity for bringing an insane defendant to trial. Justice Kennedy pointed out in his concurring opinion that the Riggins case “will require further proceedings on remand, but there seems to be little discussion about what is to be considered” in these further proceedings. Id. at _, 112 S.Ct. at 1818 (Kennedy, J., concurring). I agree with Justice Kennedy’s observation and find in Riggins v. Nevada very little that will guide state courts as to the proper constitutional procedures to be employed in cases involving the forced drugging of criminal defendants. The Majority Opinion makes no palpable effort to examine either the language or the rationale of the Supreme Court opinion; it merely glues some of the Supreme Court’s language together and, like the Supreme Court, also fails to engage in any “discussion about what is to be considered” when this case goes back for trial. Id. at _, 112 S.Ct. at 1818. Since the justices in the Majority have chosen not to discuss the difficult problems inherent in forcing a person who is accused of a crime to take drugs chosen by the state, I presume to do so.
First, I will dispose of the idea that this case has anything to do with the “safety” of Riggins or others. There is not a hint in this record that Riggins was a threat to his “own safety or the safety of others.” The Supreme Court’s discussion of the permissible use of forced tranquilizers for the restraint of persons accused of criminal conduct is a bit scary; but fortunately, in the context of this case, this language in the Supreme Court’s decision is nothing but dictum — irrelevant dictum at that. I hate to think that under the United States Constitution an accused could be forcefully tranquilized (“stoned,” as put by Dr. Jurasky; see note 1 supra) just to make him “safe,” even if “less intrusive alternatives” had to be explored first. In making a defendant “safe,” I should think that any alternative would be less intrusive than toying with an accused’s brain chemistry. Physical restraint is the common and accepted way of dealing with obstreperous or dangerous sane defendants. I see no reason why these same physical *971 means should not also be employed in the trial of insane defendants. After reading in the Supreme Court opinion in Riggins v. Nevada of the chamber of horrors resulting from the use of these drugs (e.g., “severe involuntary spasm of the upper body, tongue, throat, or eyes”; irreversible “tardive dyskinesia,” which is “characterized by involuntary, uncontrollable movements of various muscles, especially around the face,” id. at _, 112 S.Ct. at 1814-15), I would offer prefrontal lobotomy as perhaps being a “less intrusive alternative.” In any event, there is no need to discuss the safety factor because it does not relate to this case.[3]
What this case really gets down to is whether we are going to allow our courts, for any reason, to conjure a chemically-induced form of synthetic sanity in an incompetent accused by forcing the accused to put unwanted, mind-altering drugs in her or his brain. For my part, I think it is a violation of the due process clause of our state constitution to force drugs upon a person just because the person is accused of a crime, and we want to be done with it. I agree with the Louisiana Supreme Court, which concluded that it was violative of the Louisiana constitution to force-drug a murder convict until he looked sane enough to be executed. State v. Perry, 610 So.2d 746 (La. 1992). The Louisiana Supreme Court was readily able to see the obvious — that forced-drugging of this nature was not in any sense a “medical treatment,” but rather a device used by the state to carry out executions of insane people. The Louisiana court saw the use of synthetic sanity in order to carry out a death penalty as being “inherently loathsome and degrading to [the prisoner’s] dignity as a human being.” Id. at 768. When I look back at Riggins’ first trial and see the man being forced to take drugs that would “tranquilize an elephant,” I *972 see something that approaches being loathsome. I know that all the other members of the court disagree with me on this, so I will not belabor it; instead, I will go back to the question of just how, under th& federal constitution, the next Riggins trial court can be expected to “justify” forced-drugging of this unconvicted accused person and not violate the Constitution of the United States.
Believing, as I do, that no trial judge is going to take seriously a request that Riggins be force-drugged in order to make him “safe,” I will go about discussing how a trial court “might” proceed in ordering Riggins to take these drugs against his will in order for the State to “obtain an adjudication of Riggins’ guilt or innocence.” Riggins v. Nevada, _ U.S. at _, 112 S.Ct. at 1815. (As I have indicated, I cannot imagine any procedure that would allow mind-altering drugs to be forced upon a person who is accused of a crime, without violating the accused’s federal and state constitutional rights.)
In Riggins v. Nevada, the Court reminded us that the Supreme Court of the United States has “not had occasion to develop substantive standards for judging forced administration of such drugs in the trial or pretrial settings.” Id. at _, 112 S.Ct. at 1815. Although the Supreme Court has, admittedly, not developed substantive standards for judging forced administration of mind drugs, I certainly think that it is incumbent upon this court to make an effort toward developing substantive standards before we again lay this case in the lap of the trial court. The Majority Opinion makes no effort to define “substantive standards,” and leaves it all to the trial court.
The Supreme Court acknowledged in Riggins v. Nevada the possibility that the Mellaril affected Riggins’ outward appearance, the content of his testimony, and his ability to follow proceedings and the substance of his communication with counsel. Id. at _, 112 S.Ct. at 1816. In sum, said the Court, there “is a strong possibility that Riggins’ defense was impaired due to the administration of Mellaril.” Id. at _, 112 S.Ct. at 1816. The question then, is whether it is even possible to compile “substantive standards” which would assure, in the next trial, that the defense not be “impaired due to the administration of Mellaril.” I take the view (shared, it seems to me, by Justice Kennedy in his concurrence to Riggins v. Nevada) that it is probably not possible under any circumstances for the state to carry its burden of proof to show that forced mind-drugging is necessary in order to bring any accused citizen of this state to justice. It is apparent to me that we are wasting our time and that there is no way that the State can meet its burden of proof to show *973 that the use of these kinds of drugs does not violate an accused’s liberty interest in being himself.
I have asked myself how the trial court is going to proceed on its own to formulate standards that we and the Supreme Court of the United States have failed to provide. What is the trial court going to do in this case? What proof is it going to require in order to find that it is “necessary” to change Riggins’ natural brain chemistry (and, consequently, Riggins’ appearance and behavior) in order to make him competent to stand trial?
In his concurring opinion, Justice Kennedy expresses the “view that absent an extraordinary showing by the State, the Due Process Clause prohibits prosecuting officials from administering involuntary doses of antipsychotic medicines for purposes of rendering the accused competent for trial.” Id. at _, 112 S.Ct. at 1817 (Kennedy, J., concurring) (emphasis added). Justice Kennedy “doubt[s] that the showing can be made, given our present understanding of the properties of these drugs.” Id. at _, 112 S.Ct. at 1817 (Kennedy, J., concurring). I share these doubts. Justice Kennedy believes, and I do too, that when the State forces drugs upon an accused “for the avowed purpose of changing the defendant’s behavior, the concerns are much the same as if it were alleged that the prosecution had manipulated material evidence.” Id. at _, 112 S.Ct. at 1817 (Kennedy, J., concurring).
I have even more sympathy for the plight of the trial court when I examine what this court has told it to do when it tries Riggins again. I would suggest that if forced drugging is ever “necessary,” it must be established by an “extraordinary showing” that “there is no significant risk that the medication will impair or alter in any material way the defendant’s capacity or willingness to react to the testimony at trial or to assist his [her] counsel.” Id. at _, 112 S.Ct. at 1818 (Kennedy, J., concurring). This is, indeed, difficult to do. I offer for the trial court’s guidance the following language from Justice Kennedy’s concurring opinion:
[EJlementary protections against state intrusion require the State in every case to make a showing that there is no significant risk that the medication will impair or alter in any material way the defendant’s capacity or willingness to react to the testimony at trial or to assist his [her] counsel. Based on my understanding of the medical literature, I have substantial reservations that the State can make that showing.
Id. at _, 112 S.Ct. at 1818 (Kennedy, J., concurring).
I wonder what kind of expert is going to be able to testify that it *974 is “medically appropriate” to maintain Riggins’ competence through his criminal trial. (I take this to mean artificially-induced, drug-dependent “competence.”) It seems to me that this is a judgment more to be made in the field of ethics than in the field of medicine. A physician can surely testify that drugs are “medically appropriate” to treat raging psychotics like Riggins; but a physician certainly does not have the expertise to testify that the drug is necessary in order to maintain Riggins’ competence to stand trial. Perhaps a legal ethicist or a jurisprude could qualify to testify on the moral or legal necessity to bring an incompetent accused to trial by means of chemical manipulation of the brain, but not a doctor. A doctor could, perhaps, testify, “I can give him enough Mellaril so that no one can tell whether he is crazy or not; and, after taking the drug, the defendant would probably pass any legal competency test”; but this is not the same as a physician’s testifying that the drug is necessary to “maintain competence to stand trial.” My point, if not yet taken, is simply that a physician may be qualified to testify that an insane person is restorable, by the use of drugs, to a level of cognition and behavior that would permit that person to be declared legally competent to stand trial; but a physician cannot testify that it is necessary to force a person to take drugs for the purpose of maintaining legal competency to stand trial.[4]
If, nevertheless, the trial judge were to permit a physician to testify that it was medically necessary to bring Riggins into a state of ersatz sanity and medically necessary to “maintain” him in that state until the jury returns its verdict, the court still must deal with the secondary problem of whether there is some “less intrusive alternative.” (Probably psychoanalysis would be considered less intrusive than Mellaril; but who has time for that?) These drugs may well be the only effective way to deal with the symptoms of long-term psychotics who are as deeply disturbed and legally incompetent as Riggins appears to be. My guess would be that it will be rather easy to get someone to testify that there are no less-intrusive alternatives; but this does not end the problem. There is still the presumption that Riggins’ defense will be impaired by Mellaril, and even the mentioned findings of “medical” necessity do not overcome this presumption. The trial court must not only find that drugging is “necessary,” it must *975 also find that the supposedly necessary drugging does not impair Riggins’ defense, a finding that is virtually impossible to make.
I fully agree that the State has a legitimate interest in attempting to restore competence in incompetent defendants and that the State has the duty to bring accused defendants to trial. The State must stop, however, when it comes to the point of forcing drugs on accused defendants because it is thought to be expedient or “necessary.” Our liberty is too sacred to permit the state to alter our minds against our will.

At trial, Riggins was being “medicated” with 800 milligram doses of this drug. “I mean you can tranquilize an elephant with 800 milligrams. ... If you take a lot of it you become stoned for all practical purposes and can barely function.” Riggins v. State, _ U.S. _, _, 112 S.Ct. 1810, 1819 (1992) (trial testimony of psychiatrist Dr. Jack Jurasky).

Id. at _, 112 S.Ct. at 1816.

I find it odd that the Supreme Court opinion in Riggins v. Nevada relied on Washington v. Harper, 494 U.S. 210, 229 (1990), quoting from Harper with approval, “‘The forcible injection of medication into a nonconsenting person’s body represents a substantial interference with that person’s liberty,’” and going on to say “[i]n the case of antipsychotic drugs like Mellaril, that interference is particularly severe[.]” Id. at., 112 S.Ct. at 1814. I wondered why the forcible use of Mellaril did not represent “a substantial interference” with Riggins’ liberty. Then I discovered: “Taking account of the unique circumstances of penal confinement, however, we determined that due process allows a mentally ill inmate to be treated involuntarily with antipsychotic drugs where there is a determination that ‘the inmate is dangerous to himself or others and the treatment is in the inmate’s medical interest.’” Id. at _, 112 S.Ct. at 1815 (quoting Washington v. Harper, 494 U.S. at 227) (emphasis added). Finally, I understood where all the “safety” language came from. The Supreme Court was treating accused Riggins not as a citizen accused of a crime but as a criminal in “penal confinement.” Because “safety” has nothing to do with the retrial in this case, I will refrain from any further comment on this subject.

Q. Doctor, do you have an opinion, based on a reasonable degree of medical probability, as to whether it is medically appropriate and necessary to maintain Riggins’ competence to stand trial?
A. I don’t believe that as a physician I can testify as to the necessity to maintain anyone’s legal competence, much less to testify as to the necessity to maintain one’s “competence to stand trial.”