**UNITED STATES**

v.

**Lawrence ALGERE**

**No. CRIM.A. 03–86.**

United States District Court,
E.D. Louisiana.

July 5, 2005.

Gregory M. Kennedy, U.S. Attorneys, New Orleans, LA, for United States.

Gary V. Schwabe, Jr., Federal Public Defender, New Orleans, LA, for Lawrence Algere.

## ORDER AND REASONS

VANCE, District Judge.

Before the Court is the government's second motion for authorization to involuntarily medicate defendant Lawrence Algere with antipsychotic drugs to restore his competency to proceed to trial. For the following reasons, the Court GRANTS the government's motion.

## I. FACTS AND BACKGROUND

On April 4, 2003, defendant Algere was indicted for a violation of 18 U.S.C. § 922(g), possession of a firearm by a convicted felon. On May 9, 2003, on a joint motion from the government and Algere, the Court appointed a licensed psychologist, Dr. Emily Fallis at the Federal Medical Center at Fort Worth, Texas, to evaluate Algere and provide the Court with a written opinion as to his competency to stand trial and his sanity at the time of the alleged offense.

On September 5, 2003, the resulting written report diagnosed Algere with Schizophrenia, Undifferentiated Type, which is characterized by at least a one-month period in which two or more of the following occur: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms (e.g., emotional flattening and poverty of speech). In Dr. Fallis's opinion, Algere was not competent to stand trial. On September 22, 2003, the Court held a competency hearing under 18 U.S.C. §§ 4241 and 4247, at which counsel for the government, counsel for the defense and the defendant were all present. Based on the evidence received, the Court found Algere not competent to stand trial by a preponderance of the evidence and ordered that he be committed to the custody of the Attorney General for treatment under 18 U.S.C. § 4241(d). The Court also ordered that another written opinion as to Algere's competency be prepared after the treatment. Algere was admitted to the Federal

Medical Center, Mental Health Department, in Butner, North Carolina.

On August 4, 2004, Dr. Carlton Pyant, a licensed psychologist, and Dr. Bruce P. Capehart, a licensed psychiatrist at the FMC, submitted a written report reporting Algere's progress and evaluating his condition in accordance with the Court's order. Pyant and Capehart diagnosed Algere with Schizophrenia, Paranoid Type. (Rep. of 8/4/04 at 5–6). The doctors noted that paranoid ideation and marked disorganization dominated the majority of Algere's conversations and that he was intensely focused on identifying and preparing for conflict with his enemies. (*Id.* at 3–4). He was also concerned about contracting diseases from his food. (*Id.* at 5). Algere also displayed delusions about the criminal justice system, stating that he wishes to plead "not guilty with conflict of interest" meaning "statements they have against you are not valid." (*Id.* at 7). Dr. Pyant testified that Algere agreed to take Abilify less than five times and then refused it because he did not like how he felt on the medication, although no objective observations indicated the presence of any side effects. The doctors concluded that, without treatment with antipsychotic medication, Algere remained incompetent to stand trial. (*Id.* at 6).

Because Algere continued to refuse antipsychotic medication on a voluntary basis, on August 19, 2004, the government moved to authorize the FMC to medicate Algere involuntarily with antipsychotic drugs under the Supreme Court's decision in *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). On October 14, 2004, the Court denied the government's motion because there was no evidence that the procedures of 28 C.F.R. § 549.43 had been followed. That section requires that the determination of whether it is necessary to forcibly medicate an inmate because he is dangerous to himself or others in his current environment or to render him competent to stand trial be made in the context of an administrative hearing.[1] The inmate must be given twenty-four hour advance written notice of the hearing and be afforded the right to appear at the hearing, to present evidence, to be represented by a staff member, and to request that witnesses be questioned. 28 C.F.R. § 549.43(a)(2).

The administrative hearing was held on November 11, 2004 and resulted in an administrative determination that involuntary medication was not warranted on the ground that Algere was dangerous to himself or others at the FMC, in large part because he is safely housed in a single cell in a restricted unit. (Involuntary Medication Rep. of 12/2/04 at 7–10). The government does not challenge the determination that Algere is not dangerous to himself or other in his current environment. Algere remains confined at the

---

1. It appears to be the Bureau of Prisons' position that, after *Sell,* this administrative hearing procedure is no longer valid when the medication is to be administered involuntarily solely for the purposes of restoring competency for trial. *See United States v. Barajas-Torres,* No. CRIM.EP–03–CR–2011KC, 2004 WL 1598914, at *1 n. 2 (W.D.Tex. July 1, 2004). The procedure was necessary in this case, however, because there had not been any administrative determination regarding Algere's dangerousness, which *Sell* requires a court to consider before it authorizes involuntary medication on other grounds. 539 U.S. at 181–82, 123 S.Ct. 2174. The determination of an inmate's dangerousness involves prison administration and is probably better made by prison authorities and medical professionals most familiar with the inmate through frequent and ongoing clinical observation. *See Washington v. Harper,* 494 U.S. 210, 223–34, 231, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990).

FMC, no anti-psychotic drugs have been administered, and he remains incompetent to stand trial.

The government now moves for a second time that the Court order that Algere be involuntarily medicated to render him competent to stand trial. The Court scheduled a hearing on the government's motion and ordered that the government submit a supplemental report addressing several specific issues regarding the proposed treatment. The Court held a hearing on June 29, 2005, at which the Court heard testimony from Dr. Pyant and Dr. Jean Zula, the chief psychiatrist at FMC, who are both familiar with Algere's case.

The report indicates, and Dr. Pyant testified, that Algere's thinking and speech are consistently disorganized, and he continues to express fears about being physically harmed by others. On 2/23/05, for example, Algere reported suffering from a knee injury caused by someone entering his cell and attacking him while he slept. (Forensic Addendum of 6/10/05 at 3). He also thinks that the judge is working against him, and he feels "mistreated by the Court." (*Id.* at 3–4). Algere fears being "locked up on falsified legal documents." (*Id.* at 3). He displays behavioral disorganization such as wearing strips of cloth around his limbs because "you never know when someone will come up and shank you." (*Id.* at 3–4). Finally, Algere has expressed that he refuses to take antipsychotic medication because he fears: (1) being convicted of murder; (2) being vulnerable to his enemies; and (3) getting the death penalty. (*Id.* at 4). Based on the evidence produced at the hearing, the Court rules as follows.

## II. DISCUSSION

### A. Applicable Law

■ An individual has a constitutionally protected liberty interest in rejecting medical treatment. *See Washington v. Harper,* 494 U.S. 210, 211, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990) (recognizing "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs"); *Riggins v. Nevada,* 504 U.S. 127, 134, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (repeating that there is a constitutionally protected "interest in avoiding involuntary administration of antipsychotic drugs"). Such medication may be forcibly administered, however, in certain circumstances. In *Harper,* for example, the Supreme Court held that administering antipsychotic drugs against a prison inmate's will does not violate the Due Process Clause "if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Harper,* 494 U.S. at 227, 110 S.Ct. 1028. Here, however, the administrative hearing resulted in a determination that forcibly medicating Algere is not warranted on dangerousness grounds under *Harper* because Algere is not dangerous to himself or others in his current prison environment. The government does not challenge that determination. Accordingly, it is undisputed that this request involves the involuntary administration of medication to a non-dangerous defendant solely for the purposes of restoring him to competency for trial, which places it squarely within the standard set forth by the Supreme Court in *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003).

In *Sell,* the Court concluded that the government may involuntarily administer anti-psychotic drugs "to a mentally ill defendant facing serious criminal charges in order to render that defendant competent to stand trial" if certain conditions are met. *Id.* at 179, 123 S.Ct. 2174. Such treatment is authorized only if it "is medically appropriate, is substantially unlikely to have side effects that may undermine

the fairness of the trial, and, taking account of less intrusive alternatives, is necessary significantly to further important governmental trial-related interests." *Id.* The Court indicated that this standard requires consideration of four factors: (1) whether important governmental interests are at stake; (2) whether involuntary medication will significantly further those interests; (3) whether involuntary medication is necessary to further those interests; and (4) whether the administration of the drugs is medically appropriate. *Id.* at 180–81, 123 S.Ct. 2174. Although the Court did not address the standard by which the Government must establish these factors, at least one other circuit has concluded that the government must present clear and convincing evidence. *United States v. Gomes*, 387 F.3d 157, 160 (2d Cir.2004).

## B.  Analysis

### 1.  Important Government Interest

The first prong of the *Sell* test requires the Court to "find that important governmental interests are at stake." *Sell*, 539 U.S. at 180, 123 S.Ct. 2174. There is no question that "the government's interest in bringing an individual accused of a serious crime to trial is important." *Id.* At the same time, however, special circumstances "may lessen the importance of that interest." *Id.* For example, the defendant's refusal to take drugs voluntarily may result in lengthy civil confinement in an institution for the mentally ill, which diminishes the risks usually present in releasing a person who has committed a serious crime. *Id.* Similarly, the length of time the defendant has already been confined, for which he would receive credit toward any sentence imposed, might lessen the government's interest in prosecuting him. *Id.*; 18 U.S.C. § 3585(b). Finally, the government also has an interest in ensuring that the defendant receives a fair trial. *Sell*, 539 U.S. at 180, 123 S.Ct. 2174.

To determine whether a crime should be considered "serious" for the purpose of forcible administration of medication to restore competency, other courts have looked to jurisprudence on the Sixth Amendment right to a jury trial. *See United States v. Evans*, 404 F.3d 227, 237 (4th Cir.2005); *United States v. Leveck–Amirmokri*, No. EP–04–CR–0961–DB, 2005 WL 1009791, at *4 (W.D.Tex. Mar.10, 2005). Those precedents indicate that offenses for which a defendant may be sentenced to more than six months imprisonment are considered serious enough to invoke the right to a jury trial. *See Baldwin v. New York*, 399 U.S. 66, 71, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970). Most courts which have considered whether an offense is "serious" in the context of forcible medication have also followed the recent focus in the jury trial cases on the maximum penalty that can be imposed for the offense, rather than the defendant's probable sentencing guideline range. *See Evans*, 404 F.3d at 237 (basing determination as to seriousness of offense on maximum penalty defendant faced if convicted); *Leveck–Amirmokri*, 2005 WL 1009791, at *4 (same); *United States v. Kimball*, No. CR03–1025, 2004 WL 3105948, at *3 (N.D.Iowa Mar.23, 2004) (same). *But see United States v. Barajas–Torres*, No. CRIM.EP–03–CR–2011KC, 2004 WL 1598914, at *2–3 and n. 4 (W.D.Tex. July 1, 2004) (finding right to jury trial precedent inapplicable in the context of forcible medication because different interests are involved in the two analyses and that "the more accurate reflection of the seriousness of an offense given the fact-specific analysis required by *Sell* would be the relevant guideline range").

■ Algere is charged with possession of a firearm by a convicted felon, a felony carrying a maximum term of imprisonment of ten years. The Court concludes that this is a "serious" offense. *See Evans*, 404 F.3d at 238 (concluding that a felony with a maximum term of imprisonment of ten years is a serious offense "under any reasonable standard"). *But see United States v. Dumeny*, 295 F.Supp.2d 131, 132–33 (finding that charge under 18 U.S.C. § 922(g)(4) for possession of firearm by a person previously committed to a mental health institute, which carries a maximum penalty of ten years, not sufficiently serious to warrant forcible medication because there was no indication of violence in defendant's past). The particular circumstances of Algere's offense and his criminal history support the Court's conclusion that the offense is a serious one that the government has an important interest in prosecuting. Algere was previously convicted for manslaughter, a violent offense. Previously convicted criminals are prohibited from possessing guns to reduce the risk to society that they will engage in violent acts. *See U.S. v. Dillard*, 214 F.3d 88, 94 (2d Cir.2000). In light of the risk Algere's conduct presents to society, particularly considering that he has committed a violent crime in the past, and the penalty he faces if convicted, the Court finds that he is charged with a serious crime. Accordingly, the Court concludes that the government has an important interest in bringing Algere to trial.

■ The Court must also consider whether special circumstances, such as the potential for a lengthy term of civil commitment that may result from failure to take medication voluntarily and the period of confinement for which the defendant would be given credit if convicted, lessen the importance of the government's interest in this case. *Sell*, 539 U.S. at 180, 123 S.Ct. 2174. Civil commitment "may mean lengthy confinement in an institution … that would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* At the hearing, the doctors did not provide an opinion about whether Algere would be a prospect for civil commitment under 18 U.S.C. § 4246 if he were not medicated, indicating that they would have to first conduct a risk assessment.[2] Even if Algere were a prospect for civil commitment, however, the Court finds that this factor does not completely undermine the government's strong interest in bringing Algere to trial on the serious offense with which he has been charged. *See id.* ("The potential for future confinement affects, but does not totally undermine, the strength of the need for prosecution.").

2. After a defendant who is judged mentally incompetent to stand trial has been treated for a reasonable period of time, the Court may determine that the defendant's mental condition has not so improved as to permit the trial to proceed. 18 U.S.C. § 4241. In that case, the defendant is subject to the provisions of 18 U.S.C. § 4246. Under that section, if the director of the facility in which the defendant is hospitalized certifies that the defendant is suffering from a mental disease or defect as a result of which his release would create a substantial risk of bodily injury to another person or serious damage to property of another, the defendant may be committed to the custody of the Attorney General. The Attorney General releases the defendant to the appropriate official of the State in which the defendant is domiciled, or, if no State will accept responsibility, to a suitable facility for treatment until (1) such a State will assume such responsibility; or (2) the defendant's mental condition is such that his release, or his conditional release under a prescribed regimen of medical, psychiatric, or psychological care or treatment, would not create a substantial risk of bodily injury to another person or serious damage to property of another. *Id.*

As for Algere's period of confinement, he was arrested on March 25, 2003 and has been confined about 27 months. The government and the defense agree that Algere, based on his criminal history and the crime he committed, faces a likely guideline range of 41 to 51 months if convicted after a trial, or 30 to 37 months if he pleads guilty and receives a three-level reduction for acceptance of responsibility. The Court has not seen a presentence report to be able to assess conclusively what Algere's sentence would be under either scenario. Dr. Zula testified that the proposed treatment regimen would take at least four months to restore Algere to competency, and defense counsel estimated that he might require an additional month or two at most to prepare the case for trial, adding approximately six months to Algere's confinement. Although the total length of Algere's confinement is within counsels' estimated guideline range for Algere's sentence if he pleads guilty, the likelihood of which is unknown at this time, the Court again finds that this fact does not completely undermine the government's interest in prosecuting Algere. *See id.* Although these special circumstances may lessen the government's interest in prosecuting Algere, they do not override it, particularly considering the serious potential consequences of Algere's crime and his criminal history. Accordingly, the Court concludes that the government has an important interest in bringing Algere to trial on the crime with which he is charged.

### 2. Significantly Furthers the Government's Interest

The second prong of the *Sell* test requires the Court to conclude that "involuntary medication will *significantly further* " the government's interest. 539 U.S. at 181, 123 S.Ct. 2174 (emphasis in original). To do so, the Court must find that administration of the drugs is both "substantially likely to render the defendant competent to stand trial," and is "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense." *Id.* Courts have found that a 70 percent probability is sufficient to find a substantial likelihood that an anti-psychotic medication will restore a defendant to competency, but that a ten percent probability is not. *Gomes,* 387 F.3d at 161–62 (70 percent sufficient); *United States v. Morris,* No. CR.A.95–50–SLR, 2005 SL 348306, at *3 (D.Del. Feb. 8, 2005) (same); *United States v. Ghane,* 392 F.3d 317, 320 (8th Cir.2004) (five to ten percent chance of restored competence not a substantial likelihood). To satisfy its burden on this element, the government must also "set forth the particular medication, including the dose range, it proposes to administer to [the defendant] to restore his competency." *Evans,* 404 F.3d at 241. This is required "because *Sell* requires an evaluation of possible side effects, and different atypical anti-psychotics will have different side effect profiles." *Id.* at 240 (citing *Sell,* 539 U.S. at 185, 123 S.Ct. 2174 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence.")). Finally, the government must demonstrate that "the proposed treatment plan, *as applied to this particular defendant,* is 'substantially likely' to render the defendant competent to stand trial and 'substantially unlikely' to produce side effects so significant as to interfere with the defendant's ability to assist counsel in preparing a defense." *Id.* at 242 (emphasis in original); *see also United States v. Miller,* 292 F.Supp.2d

163, 164 (D.Maine 2003) (holding that adequate consideration must be given "to the question of likely side effects *to this Defendant*") (emphasis in original).

Here, the government has set forth a proposed course of forcible treatment with injectable short-acting Haldol, a first-generation antipsychotic medication, at a dose of 5–10 mg per day. (Forensic Addendum of 6/10/05 at 15). Although the doctors' treatment preference is to administer Abilify, a second-generation antipsychotic medicine, at an initial dose of 20–25 mg per day, Abilify is not available in injectable form and therefore cannot be administered involuntarily. (*Id.*). The dose of Haldol would be started at the low end of the range and gradually increased to the target range to minimize the chance that side effects will emerge. (*Id.*). Any side effects would be detected and managed through monitoring, adjustment of the dosage, switching medications, or adding a medication to reduce the side effects. (*Id.* at 10, 12).

### a. Substantially Likely to Render Defendant Competent to Stand Trial

Algere's doctors testified that treatment with antipsychotic medication such as Haldol is the primary treatment for Algere's particular condition and is substantially likely to restore Algere to competence. Dr. Zula's opinion regarding the chances of restoring Algere to competence with medication is based on three sources. First, Dr. Zula cited her experience with medicating patients involuntarily at the FMC, many of them schizophrenic, which has a 70–80% success rate of restoring them to trial competence. Second, Dr. Zula referred to a study of involuntarily medicated felony defendants in New York, most of whom had schizophrenia, which found that 93 percent of those medicated

had an unequivocally good response to the medication and that 87 percent were restored to competency, often with first generation antipsychotics such as Haldol. (*See* Literature Review, revised 6/20/05 at 2). Finally, Dr. Zula noted that the American Psychiatric Association's "Practice Guideline for the Treatment of Patients with Schizophrenia" indicates that more than 70 percent of first-episode schizophrenics achieve remission of psychotic signs within three to four months with antipsychotic medication, and 83 percent achieve stable remission at the end of one year. (*Id.* at 4). Medication does not always work, of course. According to the Guidelines, ten to 30 percent of patients have little or no response to antipsychotic medication. (*Id.*). Dr. Zula admitted that males are generally less responsive to treatment and that Algere's resistance to being medicated might affect his treatment response, but she also noted that the New York study and the FMC's success rate are all based on the administration of antipsychotic medicine to men. Based on the data and her own successful experiences, Dr. Zula maintained her opinion that treatment with antipsychotic medication generally and Haldol specifically is substantially likely to restore Algere to trial competence.

In addition, the doctors opined, based on published studies that antipsychotic medications can reduce apathy, improve cognition and improve a patient's insight into the fact that he is suffering from a psychotic illness, all of which are relevant to the restoration of competency. (Forensic Addendum at 7–8). Further, Dr. Zula testified that even if the antipsychotic medication only partially treated Algere's psychotic symptoms, that treatment would give Algere a better chance of overcoming barriers to improving his mental condition. For these reasons, the Court

finds by clear and convincing evidence that the government's proposed treatment plan is substantially likely to restore Algere to trial competence.

### b. Substantially Unlikely to Have Side Effects that Will Interfere Significantly with Ability to Assist Counsel in Conducting a Trial Defense

As for side effects from antipsychotic medication that might interfere with Algere's ability to assist counsel in his defense, the evidence indicates that such effects vary widely.[3] (*Id.* at 8). Dr. Zula testified that common side effects from Haldol, the medication the government proposes to administer to Algere involuntarily, may include the following.

*Sedation Side Effects*

Some amount of sedation is likely to be a side-effect of Haldol, along with all other antipsychotic medications, but Dr. Zula testified that the effects are not that severe and are substantially unlikely to interfere with Algere's function and ability to assist counsel. Dr. Zula also testified that sedation effects are greatest in patients who already present apathy as a symptom of their psychosis. Because Algere has a "full affect" without apathy as a symptom, he is substantially unlikely to experience sedation side-effects that will interfere significantly with his ability to assist counsel in conducting a trial defense. The doctors indicated that they will monitor for sedation side-effects and exercise good clinical practice, including changing

medication, if sedation effects appear. (*Id.* at 8).

*Abnormal Movement Side Effects*

The next group of possible short-term side effects are abnormal movements. Movement-related side effects may include stiffness and tremor, dystonic reactions, and akathisia. All first-generation antipsychotics, including Haldol, are associated with short-term movement side-effects, while second-generation antipsychotics are less associated with such effects and generally only at higher doses. (*Id.*). These side effects are generally managed by reducing the dose or, if reducing the dose would render the antipsychotic property of the drug ineffective, another medication is prescribed to control the effects or the antipsychotic medication is changed. (*Id.* at 8–10).

Dr. Zula testified that stiffness, tremor and mask-like facial expression, which occurs in 15 to 50 percent of individuals treated with first-generation anti-psychotics, can be minimized easily through dose reduction. (Literature Review at 13). If not, benztropine or diphenhydramine are prescribed to relieve these symptoms. (Forensic Addendum at 10). Acute dystonia, which typically manifests as a muscle spasm in up to 10 percent of patients treated with first-generation antipsychotic medication, is easily and effectively relieved by administering an anticholinergic medication. (Literature Review at 14). Akathisia, an uncomfortable restlessness or tension that may produce objective signs of restlessness, occurs in 20 to 30 percent of individuals treated with first-

---

**3.** Once Algere's mental state is stabilized, the doctors opine that the dosage of any antipsychotic medication can be lowered to the minimum dose required to maintain his mental stability, which will minimize the risk of side effects. (*Id.* at 12). They also point out that Algere's anxiety may be reduced after his legal proceedings are over, which would also allow for a reduction in the dosage. (*Id.*). These considerations regarding what might happen in the future, however, are not relevant to the present purpose of determining whether the medication is currently appropriate for the purpose of restoring Algere's competence to stand trial.

generation antipsychotics and is treated by reducing the dose of the antipsychotic, switching medications or prescribing an additional medication. (*Id.* at 13). Tardive dyskinesia, the manifestation of writhing movements of muscles in the fingers, hands, arms, lower extremities, or face and tongue, is a side-effect of long term use of first-generation antipsychotic medications at a rate of approximately five percent per year after one year of use, with 60 to 70 percent of the cases described as mild and three to 10 percent described as severe. (*Id.* at 14; Forensic Addendum at 12). Tardive dyskinesia does not interfere with cognition, but more severe cases might be noticeable in a court proceeding. There is a lower risk for development of the disorder, however, in patients Algere's age. (*Id.* at 16). Dr. Zula also testified that during trial, these kinds of movement side effects could be managed with the administration of another medication and, in her opinion, they are substantially unlikely to interfere significantly with Algere's ability to assist his counsel in conducting a trial defense.

*Endocrinological Side Effects*

The final group of potential side effects are endocrinologic side effects. Most first-generation and some second-generation antipsychotics can cause elevated prolactin levels, which may affect the regulation of other hormones and manifest in 25 to 50 percent of men as erectile dysfunction. (Forensic Addendum at 12). The elevated levels "frequently" return to normal when the medication dose is decreased or when a different medication is prescribed. (*Id.*).

The metabolic syndrome is another recognized side effect of second-generation antipsychotic medications and can cause "elevations in weight, blood pressure, blood sugar and cholesterol". (*Id.* at 12). This side effect is detected through a mandatory metabolic monitoring program at the FMC that includes monitoring weight, blood pressure, and serum lipid and glucose levels and also involves dietary and exercise educational classes. (*Id.* at 13). If the metabolic syndrome occurs, appropriate intervention is prescribed, such as dietary changes, recommended exercise, medications for high blood pressure or cholesterol, or a change in antipsychotic medication. (*Id.*). The doctors point out that these endrocrinologic side effects are not the kind of effects that would interfere with Algere's ability to assist counsel in his defense.

Finally, rare and unpredictable reactions to medication are always possible. (*Id.* at 11). For example, neuroleptic malignant syndrome, cause by blood pressure instability and the breakdown of tissue toxic to kidneys, may be fatal. However, it is rare and can be treated by stopping the administration of antipsychotic medication and taking supportive measures. (*Id.*). Medical allergies are also possible, but Dr. Zula testified that the medication will first be administered in a small test dose to reduce the severity of any potential reaction.

The Court finds that the doctors have carefully considered the benefits and risks for Mr. Algere's proposed treatment and that the proposed treatment with antipsychotic medication is substantially likely to restore Mr. Algere's competency to stand trial and substantially unlikely to produce side effects that will interfere significantly with his ability to aid in his defense.

### 3. No Less Intrusive Means

■ The third prong of the *Sell* test requires the Court to conclude that involuntary medication is necessary to further the government's interests by finding "that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Sell*, 539 U.S. at 181, 123 S.Ct. 2174. Here, the evidence in the

record indicates that no less intrusive treatments are likely to achieve substantially the same results. Both doctors testified that the chances are very slim that Algere will become competent to stand trial without taking antipsychotic medication, because their experience indicates that restoration of competency rarely happens without the administration of antipsychotic medication. The doctors noted that Algere has been at the FMC for more than twelve months without significant change in his condition. (*Id.* at 13–14). Dr. Zula testified that alternatives such as cognitive behavioral therapy are unlikely to help Algere because a patient has to be receptive to that kind of therapy for it to be effective, and Algere is unwilling to re-examine his delusions. In addition, the doctors have tried and have been unable to engage Algere in these kinds of therapies. The Court therefore finds that less intrusive means are unlikely to achieve substantially the same results as the administration of antipsychotic medication.

The Court is also required to consider whether the less intrusive means of ordering Algere to undergo the treatment, on pain of contempt, might achieve the same result. *Sell,* 539 U.S. at 181, 123 S.Ct. 2174. Considering that Algere remains incompetent, continues to refuse all medication and has indicated that he thinks the Court is part of a conspiracy against him, a Court order threatening contempt would be unlikely to affect Algere's willingness to take the medication. *See Gomes,* 387 F.3d at 163 (finding that, because defendant repeatedly refused all chemical treatment and appeared to believe that the judiciary was enlisted in a conspiracy against him, a court order was not likely to achieve the same results as forcible medication); *Morris,* 2005 WL 348306, at *5 (finding that, as defendant was unable to understand his legal situation, a contempt order would be worthless). The Court will nevertheless

order that medical personnel treating Algere request that Algere voluntarily take antipsychotic medication by oral method before any medication is administered involuntarily. The Court concludes that involuntary medication is necessary to further the government's interest because it finds that less alternative treatments are unlikely to achieve substantially the same results.

### 4. Medical Appropriateness

■ The fourth prong of the *Sell* test requires the Court to "conclude that administration of the drugs is medically appropriate, *i.e.,* in the patient's best medical interest in light of his medical condition." 539 U.S. at 181, 123 S.Ct. 2174. The government must demonstrate that the particular defendant's individual mental and physical condition have been considered in evaluating the proposed course of treatment and concluding that it is medically appropriate. *Evans,* 404 F.3d at 240–41. To do so, the government must:

> spell out why it proposed the particular treatment, ... provide the estimated time the proposed treatment plan will take to restore the defendant's competence and the criteria it will apply when deciding when to discontinue the treatment, describe the plan's probable benefits and side effect risks for the defendant's particular medical condition, ... show how it will deal with the plan's probable side effects, and explain why, in its view, the benefits of the treatment plan outweigh the costs of its side effects.

*Evans,* 404 F.3d at 242.

■ Most of these criteria have already been addressed, and the Court finds that the proposed treatment in this case is medically appropriate for Algere. Antipsychotic medication is the standard treat-

ment for Algere's condition, whether inside or outside of an institution like the FMC. (Forensic Addendum of 6/10/05 at 14). Left unmedicated, Algere is subject to adverse consequences, including increased risk of suicide and increased risk of death from natural causes. (*Id.* at 6). Untreated psychosis may even result in permanent damage to a person's brain function. (*Id.* at 7). The proposed treatment has numerous potential positive effects and is expected to significantly improve Algere's quality of life. The doctors testified that Algere lives in a state of constant fear and anxiety, convinced that others are constantly plotting against him, and they are unable to convince him otherwise. The proposed treatment is likely to relieve Algere of these fears and thereby reduce his anxiety and stress. It is also expected to improve Algere's insight into his illness, which may result in his acceptance of medication voluntarily. Indeed, the doctors testified that the proposed treatment is necessary to alleviate Algere's suffering and is his only chance to function as an independent member of society. Further, they are unaware of any medical condition Algere has that would be worsened by the administration of the medication or of any other condition that could explain his psychotic symptoms. (*Id.* at 14–15). Any side-effects will be managed as described, and Algere will be placed on the metabolic monitoring protocol to detect any endocrinologic side-effects that may emerge. (*Id.*).

The evidence indicates that the doctors have considered the benefits and potential side effects and concluded that treatment with antipsychotic medication is appropriate for Algere. The treatment will involve a careful oversight by a psychiatrist, who will prescribe medication at an appropriate dosage and monitor Algere for both therapeutic and side effects of the treatment. Based on the June 10, 2005, report and the testimony of Drs. Pyant and Zula, the Court concludes that the proposed administration of anti-psychotic medication is justified because the government has established by clear and convincing evidence that it is medically appropriate, is substantially unlikely to have side effects, and, taking account of less intrusive alternatives, is necessary to further the important governmental interest of rendering Algere competent to stand trial for a serious offense.

## III. CONCLUSION

Having considered the *Sell* factors and Algere's current lack of competence to stand trial, the Court continues Algere's commitment pursuant to 18 U.S.C. § 4241(d)(2)(A) and GRANTS the government's motion to have Algere medicated involuntarily to render him competent to stand trial, under the following conditions. FMC personnel must provide Algere with a copy of this Order and Reasons, explain to him the potential side effects of Abilify, and advise him that Abilify must be taken orally at appropriate intervals. They must also explain the potential side effects of Haldol and advise Algere that Haldol is administered by injection at appropriate intervals if he refuses to take Abilify orally. **All medical personnel treating Algere shall request that Algere voluntarily take medication orally before each and every administration of medication by injection.** If Algere does not agree to take Abilify orally within ten days of the date of this Order, FMC personnel are authorized to administer Haldol by injection over Algere's objection.

Algere shall be confined at the FMC for four months, or a lesser period if reasonably sufficient to restore him to competency. At the end of four months, or when Algere's competency is restored if that occurs in less than four months, a report shall be filed with the Court detailing the

results of the treatment. The report must set forth the criteria that are used to determine whether Algere has been restored to competence to stand trial and the result of the application of those criteria to Algere's case. If the doctors conclude that Algere has been restored to competence to stand trial, they must also set forth what side effects Algere has experienced on the medication and how the medication will affect Algere at trial.