UNITED STATES of America, Plaintiff,

v.

Javier GONZALEZ–AGUILAR, Defendant.

No. CR 04–1702–TUC–CKJ(CRP).

United States District Court, D. Arizona.

July 13, 2006.

Ronald Raul Reyna, The Reyna Law Firm PC, for Defendant.

### ORDER

PYLE, United States Magistrate Judge.

Pending before the Court are proceedings to determine if Defendant's mental

competence to stand trial can be restored. Specifically, the Bureau of Prisons (BOP) has asked this Court to enter an order allowing the involuntary administration of psychotropic medication for the sole purpose of restoring Defendant's competence to stand trial. Because BOP never pursued the mandatory administrative procedures required by 28 CFR § 549.43, this Court orders that Defendant be remanded into the custody of the Attorney General for the purpose of following the required administrative procedures for involuntary psychiatric treatment.

## FACTS

Defendant was arrested on July 22, 2004, and subsequently charged with illegal reentry after deportation with a prior aggravated felony conviction. 8 U.S.C. § 1326(b)(2). Over the next ten months, the case proceeded with difficulty, including a change in defense counsel, a status conference to explain the proposed plea agreement and a vacated change of plea hearing.

On May 4, 2005, defense counsel filed a Motion for Mental Examination (Dkt.27) to determine Defendant's mental competence to stand trial. On December 27, 2005, the Court ordered Defendant committed to the custody of the Attorney General to determine if Defendant's mental competence could be restored. Defendant was ultimately placed for treatment at the Mental Health Department of the Federal Medical Center in Butner, North Carolina (FMC–Butner). Defendant was received at FMC–Butner on February 1, 2006. Ultimately, a Forensic Evaluation was prepared on June 6, 2006 by Jill R. Grant, Psy.D. and Bruce R. Berger, M.D.

At FMC–Butner, Defendant was placed in a restricted movement unit for one day before being transferred to an open mental health housing unit. Within a few days it was necessary to transfer Defendant to administrative detention for breaking facility rules. Subsequently, Defendant was changed from administrative detention to psychological status. Defendant was in the restricted movement unit for the rest of his evaluation. (Forensic Evaluation, pp. 4–5). While in holdover status at the Federal Transfer Center in Oklahoma and U.S. Penitentiary in Atlanta, before being received at FMC–Butner, Defendant was also "primarily housed in the secure housing setting." (Id. at 3.)

Psychological testing was not performed "due to Mr. Gonzalez–Aguilar's unstable mental status, which included bizarre and disorganized behavior and general uncooperativeness." (Forensic Evaluation, p. 5). His lucid moments were few, and he frequently appeared to be experiencing auditory hallucinations. (Id.). Defendant refused all psychiatric treatment including anti-psychotic medication. (Id. at 4). Because of his lack of cooperation, an exact diagnosis was not determined, but the likely diagnosis is schizophrenia. (Id. at 5, 6, 7).

Defendant consistently refused anti-psychotic medication. However, there is no indication in the Forensic Evaluation that FMC–Butner staff ever pursued the involuntary psychiatric treatment procedures required by 28 CFR § 549.43. The Forensic Evaluators concluded that Defendant was incompetent to stand trial.

> He exhibits symptoms of active psychosis, including bizarre and disorganized behavior, observed response to internal stimuli (e.g. hallucinations), and incomprehensible speech at times. He is unable to hold a rational conversation and does not have a good understanding of his current circumstances.

(Forensic Evaluation, p. 6).

The evaluators request a judicial order allowing the involuntary administration of

anti-psychotic medication to Defendant in order to restore his mental competence to stand trial. (*Id.* at 7–9). The evaluators conclude that other reasons to involuntarily treat Defendant are not appropriate:

> [b]ecause [Gonzalez–Aguilar] can be *safely managed in a restricted movement unit;* maintains adequate personal hygiene and room sanitation with assistance; maintains practices of adequate nutritional intake; and is not overly threatening to himself or others *in that setting;* he does not meet criteria for involuntary treatment pursuant to *Harper* criteria.

(emphasis added) (*Id.* at 7).

Defendant was previously evaluated on December 1, 2005, by Hector J.F. Barillas, Ph.D., pursuant to Court order. Dr. Barillas issued a Competency to Stand Trial Evaluation (Barillas Evaluation) dated December 31, 2005. This document was never received by FMC–Butner. (Forensic Evaluation, p. 2).

In December 2005, Dr. Barillas concluded Defendant may be competent to stand trial, although found him to be uncooperative, intimidating and possibly malingering. At the time of the evaluation, Dr. Barillas was told by the transport officers that Defendant had been housed "in the hole." [1] (Barillas Evaluation, p. 2). Dr. Barillas had concerns for his physical safety in dealing with Defendant,

> . . . because of the foreboding quality of his demeanor, the Examiner made the exceptional request for one of the officers to be in the interviewing office at all times.

(*Id.*) Dr. Barillas found Defendant to be oriented as to person, time, place and purpose. "Thought processes were logical, but marked by possible concreteness and occasional incoherence when defensive." (*Id.* at 4). Dr. Barillas found Defendant exhibited no signs of psychosis or hallucinations. (*Id.* at 5).

## LAW

■ Jails and prisons have the obligation to provide essential medical treatment to those in their custody and have the obligation to protect staff and detainees from physical harm. Detainees retain a liberty interest in refusing unwanted medical treatment. A tension between these interests and obligations not infrequently occurs.

In 1980, the Supreme Court determined that an inmate must be afforded procedural due process protections before he can be involuntarily transferred to a mental hospital. *Vitek v. Jones,* 445 U.S. 480, 495–96, 100 S.Ct. 1254, 1265, 63 L.Ed.2d 552(1980). The administrative procedures required were consistent with those required for a fair hearing in *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); written notice of transfer, a hearing before an independent decision-maker, and the opportunity to present evidence and question witnesses. *Id.* Additionally, the Court determined that the inmate was entitled to some assistance in the process, but there was no majority on whether a lawyer must be appointed to represent him. In a concurring opinion, Justice Powell suggested such assistance could be provided by "competent laymen." *Id.* at 500, 92 S.Ct. 2593, 100 S.Ct. at 1267.

Ten years later, the Supreme Court determined that procedural due process did not require a judicial hearing before a prisoner could be involuntarily medicated with anti-psychotic drugs. *Washington v.*

---

**1.** The Court presumes this is a slang reference to segregated confinement with no access to the open population in the CCA facility.

*Harper,* 494 U.S. 210, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). Rather, the Court held that the administrative hearing process developed by the State of Washington in response to *Vitek v. Jones* satisfied due process guarantees. In the Washington scheme, a prisoner could be involuntarily medicated, if a committee, after an administrative hearing, determined that "the inmate suffers from a mental disorder and is gravely disabled or dangerous (to himself, others or their property)." *Washington v. Harper,* 494 U.S. at 215, 110 S.Ct. at 1033.

In *Washington v. Harper, supra.,* the Court first determined that the prisoner possessed a "significant liberty interest in avoiding the unwanted administration of anti-psychotic drugs." *Id.* at 221, 110 S.Ct. at 1036. However, the Court recognized that the State had a legitimate and important interest in treating mentally ill prisoners who posed a danger to others.

> We confront here the State's obligations, not just its interests. The State has undertaken the obligation to provide prisoners with medical treatment consistent not only with their own medical interests, but also with the needs of the institution. Prison administrators have not only an interest in ensuring the safety of prison staffs and administrative personnel, see *Hewitt,* 459 U.S. at 473, 103 S.Ct. at 872, but also the duty to take reasonable measures for the prisoners' own safety. See *Hudson, supra,* 468 U.S. at 526–527, 104 S.Ct. at 3200–3201. These concerns have added weight when a penal institution, like the SOC is restricted to inmates with mental illnesses. Where an inmate's mental disability is the root cause of the threat he poses to the inmate population, the State's interest in decreasing the danger to others necessarily encompasses an in-

terest in providing him with medical treatment for his illness.

*Id.* at 225–26, 110 S.Ct. at 1039.

The Court rejected the suggestion that the institution must apply to the state probate court for a determination of incompetency, thus obtaining approval for the treatment under a "substituted judgment" standard. *Id.* at 226, 110 S.Ct. at 1039. The Court also rejected physical restraints and seclusion as appropriate accommodations in lieu of involuntary medications, for the failure to show these methods to be medically effective at a *de minimus* cost to the institution. *Id.* at 226–27, 110 S.Ct. at 1039.

Ultimately, the Court determined that the State of Washington's administrative process satisfied the Due Process Clause. In doing so, the Court noted that:

> ... requiring judicial hearings will divert scarce prison resources, both money and staff's time, from the care and treatment of mentally ill inmates.
>
> .    .    .    .    .
>
> .    .    .    .    .

*Id.* at 232, 110 S.Ct. at 1042. Because the Due Process Clause does not require a neutral and detached trier of fact, the Court determined that a judge was not required for the decision to involuntarily medicate a patient. In fact, the Court suggested that medical professions were better situated to make this decision.

> Particularly where the patient is mentally disturbed, his intentions will be difficult to assess and will be changeable in any event. (cites omitted) ... We cannot make the facile assumption that the patient's intentions, or a substituted judgment approximating those intentions, can be determined in a single judicial hearing apart from the realities of fre-

quent and ongoing clinical observation by medical professionals.

*Id.* at 231, 110 S.Ct. at 1042

In response to *Washington v. Harper*, the Justice Department, Bureau of Prisons, established an administrative procedure for delivering involuntary psychiatric treatment and medication. 28 CFR § 549.43 (1992). This regulation provided for notice, an administrative hearing, adjudication by a psychiatrist not involved in treating the inmate and the right to have a staff representative of the inmate. *Id.*

In 1992, the Supreme Court held that a competent defendant had the right to refuse to continue taking anti-psychotic medication during his trial, unless the State could show that the treatment was medically necessary, there were no less intrusive alternatives, and the treatment was necessary to prevent the defendant from harming himself or others. *Riggins v. Nevada*, 504 U.S. 127, 135, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). Justice Kennedy, in a lengthy concurring opinion, suggested it would be very rare that anti-psychotic drugs could be involuntarily administered solely for the purpose of allowing a defendant to be competent to stand trial. *Id.* at 138–39, 112 S.Ct. at 1817. Of particular concern in *Riggins* were potential side effects of the drug that would undermine the fairness of the trial, particularly how the defendant appeared to the jury.

The Supreme Court's most recent pronouncement on this subject came during the October 2002 Term in the case of *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). *Sell* involved a former dentist with a lengthy and very troubled mental health history, including inpatient mental health hospitalizations and anti-psychotic medication. In the course of pretrial proceedings concerning federal criminal charges, Sell asked the court for a determination of his compe-

tence to stand trial. The magistrate judge in the case determined Sell to be incompetent to stand trial and ordered Sell hospitalized at the Federal Medical Center in Springfield Missouri for examination and restoration of competence. *Id.* at 170–71, 123 S.Ct. at 2179. At FMC–Springfield, the medical staff recommended that Sell take anti-psychotic medication, but he refused. *Id.* An administrative hearing was held and involuntary administration of the anti-psychotic medication was authorized because Sell was "mentally ill and dangerous, and medication is necessary to treat the mental illness" and so that Sell could be restored to competency. *Id.* at 171–72, 123 S.Ct. at 2180. While Sell was determined to be dangerous in a community setting, it was acknowledged that Sell functioned in an open prison population without problem. *Id.* An administrative appeal affirmed that authorization.

Sell filed a motion in his criminal case asking the court to revoke the authorization to involuntarily administer anti-psychotic medication. A hearing was held, which included testimony about Sell's inappropriate behavior in telling a nurse he loved her. *Id.* at 172–73, 123 S.Ct. at 2180. By the time of this hearing Sell was in a locked cell, segregated from the open prison population. *Id.* at 173, 123 S.Ct. at 2180. The magistrate judge ordered that Sell be involuntarily medicated, both because of dangerousness and to restore mental competence. *Id.* at 173, 123 S.Ct. at 2180–81.

Sell filed an appeal from this ruling to the district judge. Noting that Sell had been returned to an open ward, the district judge found the determination of dangerousness to be clearly erroneous. The judge upheld the involuntary medication order for purposes of rendering defendant competent to stand trial. *Id.* at 173–74, 123 S.Ct. at 2181. The district judge ruled

that it was premature to determine whether administering anti-psychotic medication to Sell would adversely affect the fairness of the trial.

A divided panel of the Eight Circuit Court of Appeals affirmed the ruling of the district court. 282 F.3d 560 (8th Cir.2002). The Court of Appeals upheld the finding that Sell was not dangerous to self or others, and determined that the charges were serious enough to support the government's interest in bringing Sell to trial.

The Supreme Court granted certiorari to determine whether Sell could be deprived of his liberty interest in refusing medication solely for purposes of rendering him competent to stand trial for non-violent offenses. Looking to *Harper* and *Riggins,* the Court held that a defendant facing serious criminal charges may be involuntarily medicated to restore mental competence, if the treatment is medically appropriate, will not undermine the fairness of the trial and less intrusive alternatives are not available. *Id.* at 179, 123 S.Ct. at 2184.

■ Justice Breyer, echoing Justice Kennedy's concurring opinion in *Riggins,* emphasized that instances justifying involuntary medication solely to restore mental competence will be rare. *Id.* at 180, 123 S.Ct. at 2184. Specifically, the Opinion states:

> A court need not consider whether to allow forced medication (to restore mental competence), if forced medication is warranted for a different purpose, such as the purposes set out in *Harper* related to the individual's dangerousness, or purposes related to the individuals own interest where refusal to take drugs puts his health gravely at risk. (cite omitted). There are often strong reasons for a court to determine whether forced administration of drugs can be justified on these alternative grounds

> *before* turning to the trial competence question.

(emphasis in original), *Id.* at 181–82, 123 S.Ct. at 2185. The Court noted that issues related to dangerousness and medical necessity of the medication are more objective and appropriate for medical professionals to analyze than the legal nuances of competence to stand trial. Prior analysis of those issues brings a sharper focus to the competence issue, should it become necessary. *Id.* at 182–83, 123 S.Ct. at 2185–86. Therefore, the Supreme Court instructs courts to determine why forced administration of drugs was not sought on *Harper* grounds, before considering the issue solely in the context of restoring mental competence. *Id.* Regrettably, this unmistakable directive by the Court to consider *Harper* criteria first has been systematically ignored by the Bureau of Prisons since the *Sell* decision was issued.

### ANALYSIS

■ The facts of this case illustrate a fundamental flaw in the handling of involuntary medication issues by the Federal Bureau of Prisons (BOP). BOP will not seriously consider *Harper* criteria as a basis for involuntarily medicating a patient, but will instead rely exclusively on the protective umbrella of a court order issued applying *Sell* criteria. This is a tremendous disservice to the courts, the staff and patients at federal medical facilities, and the patient-defendants. This time-consuming, dangerous and medically inappropriate practice needs to come to an end.

When a patient refuses psychotropic medication at a Federal Medical Center, the administrative hearing process "will" be instituted. 28 CFR § 549.43(a). At that hearing, the patient will have a staff representative who can assist in questioning witnesses, and, logically, confer with

the patient concerning voluntary administration of an anti-psychotic drug.

> The psychiatrist conducting the hearing shall determine whether treatment or psychotropic medication is necessary in order to attempt to make the inmate competent for trial or is necessary because the inmate is dangerous to self or others, is gravely disabled, *or is unable to function in the open population of mental health referral center or a regular prison.* The psychiatrist shall prepare a written report regarding the decision.

(emphasis added). 28 CFR § 549.43(a)(6).

In this case, after Defendant refused medication, no administrative hearing was held. While a half-hearted *Harper* analysis was set forth in the Forensic Evaluation (p. 7), that evaluation presumed a restricted environment. This is contrary to the explicit, objective standard set forth in 28 CFR § 549.43(a)(6).

The Government in this case did not move the Court for an order to involuntarily medicate Defendant. Rather, the request came in a letter to the Court from the Warden of FMC–Butner. This is the common practice of BOP. *United States v. Barajas–Torres,* 2004 WL 1598914, *1 n. 1 (W.D.Tex.2004); *United States v. Kourey,* 276 F.Supp.2d 580, 582–83 (S.D.W.Va. 2003). It is inappropriate for BOP to determine whether or not prosecutorial interests are so significant that a medication order issued pursuant to *Sell* should be pursued.

This Court went down this path with BOP almost immediately after the *Sell* decision in case No. CR 03–959–TUC–RCC(CRP), in the District of Arizona. In that case, the defendant was sent to FMC–Springfield to restore mental competence. He refused to take his medication. The attorney for FMC–Springfield sent the Court a letter asking the Court to conduct a *Sell* hearing. In the letter, the attorney advised the Court as follows:

> Prior to the *Sell* decision, the Bureau of Prisons utilized the provisions of 28 CFR Part 549, Subpart C, to protect a pretrial inmate's liberty interest in avoiding the involuntary administration of anti-psychotic medication. The General Counsel for the Bureau of Prisons has opined that the *Sell* decision has rendered unconstitutional any decision by Bureau of Prisons psychiatrists to involuntarily administer anti-psychotic medication to a pretrial inmate without specific judicial approval under the conditions referenced in the *Sell* decision.

*Id.,* Order, April 22, 2004, (Dkt 45), pp. 2–3. The defendant was held in lockdown status for all but two days of the four months he was treated at FMC–Springfield.[2] Other Courts have faced this BOP blanket policy of refusing to medicate using the administrative procedure. *United States v. Barajas–Torres, supra.,* at n. 2.; *United States v. Algere,* 396 F.Supp.2d 734, n. 1 (E.D.La.2005); *United States v. Kourey,* 276 F.Supp.2d 580, 582 (S.D.W.Va.2003).

The BOP's position that they no longer have authority to involuntarily medicate patients cannot be justified. This position requires *Sell* to be interpreted to overrule *Washington v. Harper,* where the sole issue was whether the administrative procedure satisfied due process or whether a judicial process would be required. The Court held that a judicial process was not required, and there is no language in *Sell* that can be interpreted to overrule that

---

**2.** This Court did not order defendant medicated pursuant to *Sell,* because *Harper* grounds no doubt existed and could be resolved in an administrative hearing. The defendant was involuntarily medicated at FMC–Springfield on an emergency basis. 28 CFR § 549.43(b).

holding. Rather, in the *Sell* opinion, the Court frequently cites *Washington v. Harper* positively, and emphasizes the advantage of having these decisions made in a medical context. Other courts have disagreed with the BOP interpretation. *United States v. Barajas–Torres, supra.*, at n. 2; *United States v. Algere, supra.*, at 737 n. 1; *United States v. Kourey, supra.*, at 581; *United States v. White*, 431 F.3d 431, 434–35 (5th Cir.2005). In *Kourey* and *White*, the courts specifically held it was premature to consider *Sell* issues before the *Washington v. Harper* administrative proceeding was held. This Court is unaware of any authority that supports BOP's position and finds the BOP interpretation of *Sell* to be erroneous and frivolous. While the Court refers to a "court" determining *Washington v. Harper* grounds before turning to *Sell* restoring competency issues, that off hand reference cannot be read to overrule *Washington v. Harper*. *Sell*, 539 U.S. at 182, 123 S.Ct. at 2185.

In this case, it seems likely that had an administrative hearing been properly conducted, Defendant would have been determined to be gravely disabled and unable to live in an open population. The staff at FMC–Butner knew Defendant had to be placed in a restricted environment throughout his stay there. They knew he was held in segregation in Oklahoma and Atlanta while he was transitioning from Tucson to Butner. They knew he was hallucinating and rarely lucid. The staff suspected schizophrenia, and thus, if considered, might have been concerned that his condition would worsen if he was not involuntarily medicated.[3] Had the staff at FMC–Butner been aware of Dr. Barillas' report, they would have known Defendant's condition was dramatically worsening. Regardless, there was overwhelming evidence that under at least two of the criteria in 28 CFR § 549.43(a)(5), gravely disabled and unable to function in an open population, there was justification to involuntarily medicate Defendant.[4]

In addition to these considerations, when conducting an administrative hearing the staff at FMC–Butner must consider whether or not the condition is worsening and whether isolation and physical restraints will cause the condition to worsen. It seems intuitive that long term use of isolation or physical restraints would have a significant detrimental impact on a patient's health.

At this time the Court believes Defendant must be remanded to FMC–Butner to conduct a *Washington v. Harper* hearing. At the status conference, the Court scheduled a *Washington v. Harper/Sell* hearing before the Court, out of concern for the two years Defendant has been in custody. However, it is clear that the *Washington v. Harper* hearing is better conducted in the administrative context. There, a psychiatrist not involved in treating Defendant

---

**3.** "Finally, in light of medical testimony that schizophrenia, if left untreated in a patient defendant's age, may result in permanent mental disorder ..." *Barajas–Torres, supra.* Also, defendant's medical condition was worsening in *Kourey*, but BOP refused to conduct an administrative hearing to involuntarily medicate the patient. *United States v. Kourey*, 276 F.Supp.2d at 582.

**4.** Even though Sell did live in the open population in prison and at the mental health facility, Justice Breyer suggested that dangerousness would have been appropriate justification to involuntarily medicate Sell, but the issue was not before him in the case. *Sell*, 539 U.S. at 184, 123 S.Ct. at 2186. Here the FMC–Butner determination that Defendant was not dangerous was limited to a restricted environment, which is inappropriate. Medicating Defendant based on dangerousness may also be appropriate.

will determine if there is a medical basis, gravely disabled, dangerous to self, others or property, or unable to function in open population, to involuntarily medicate Defendant. Defendant will have a knowledgeable staff representative. That cannot be provided by the Court. Moreover, defense counsel offers little protection, since he gets no meaningful direction from his client. Defense counsel does not play the role of substituted judgment, nor does anyone else. Defense counsel essentially operates without direction, which is of no benefit to his client. In fact, defense counsel likely wants his client to be involuntarily medicated.[5]

The Court is concerned about the time delay. This Defendant will be returned to this Court either competent or incompetent to stand trial. In either scenario, the length of sentence he likely faces will be important to the expeditious resolution of the case. Therefore, the Court is ordering the Probation Department to prepare a preliminary presentence investigative report with a guideline sentencing range work-up.

The Court is going to stay this order for ten days to give BOP and the Government the opportunity to appeal this ruling to the District Judge. If BOP considers *Washington v. Harper* to have been overruled by *Sell,* that needs to be determined by an appellate court. If BOP agrees they have authority to involuntarily medicate patients under 28 CFR § 549.43, they need to conduct those hearings, and evaluate their patients with greater care than is exhibited by this record.

BOP's failure to pursue the administrative hearing process in these cases is very detrimental to all participants in the criminal justice process, and even more detrimental to the patients themselves. Long delays occur while a patient's medical condition deteriorates. The Government and the defendant are harmed by the inability to get the case resolved. The defendant's conditions of custody are both harmful to him and extra expensive to the Government. All of these harms are unnecessarily imposed by BOP's overly cautious and erroneous interpretation of *Sell.* That must be corrected.

**WHEREFORE, IT IS HEREBY ORDERED** that:

1. Defendant is remanded to the custody of the Attorney General for treatment to restore mental competency for a period of up to 120 days;

2. Upon receipt of Defendant, the staff at FMC–Butner is ordered to forthwith conduct an administrative hearing pursuant to 28 CFR § 549.43, and that the report issued as a result of that hearing shall promptly be forwarded to the Court and counsel in this case;

3. The request for a court order to involuntarily medicate Defendant is **denied;**

4. The hearing scheduled for Tuesday, August 1, 2006 at 1:30 p.m., and the status conference scheduled for Monday, July 17, 2006 at 9:30 a.m., are **vacated;**

5. A status hearing is set for ***Tuesday, January 16, 2007 at 9:30 a.m.,*** before the Honorable Charles R. Pyle, Courtroom 5F;

6. No action will be taken on any letter from FMC–Butner requesting court relief

---

**5.** In *Khourey,* defense attorney Skaggs joined the government in requesting the court to order Khourey to be medicated involuntarily. *Khourey,* 276 F.Supp.2d at 583. In *United States v. Baldovinos,* 434 F.3d 233, 237 (4th Cir.2006), defense counsel filed no objection to the request that his client be involuntarily medicated. In *United States v. Ballesteros,* 2006 WL 224437 (E.D.Ca.2006), defense counsel merely suggested tricking his client into taking the medication.

or action absent an appropriate written motion filed by counsel for BOP or the attorney for the Government in this case;

7. The Probation Department is ordered to prepare a preliminary presentence investigative report, including Sentencing Guidelines calculations, within seventy (70) days of the date of this order;

8. This order is **stayed** for ten (10) days. Thereafter, the USMS shall as expeditiously as possible transport the Defendant to FMC–Butner. The USMS is requested to begin making travel arrangements before the stay expires, but not transport until after the stay expires.

9. The attorney for the Government is ordered to forward a copy of the Competency to Stand Trial Evaluation dated December 31, 2005, prepared by Hector J.F. Barillas, Ph.D. to Jill R. Grant, Ph.D. and Bruce R. Berger, M.D. at FMC–Butner.

10. The parties have ten (10) days to file a written appeal of this order with District Judge Jorgenson.